## MAGGIE R. DAUSMAN v. EUGENE C. RANKIN, Appellant.

### Division Two, June 20, 1905.

1. **WILLS: Undue Influence.** Influence that would be undue and that will authorize the setting aside of a will, must be something more than the influence of affection or attachment, or the result of a desire on the part of the testator of gratifying the wishes of one beloved, respected and trusted by him; it must be such influence as amounts to over-persuasion, and coercion or force, destroying the free agency or will power of the testator.

2. ———: ———: **Proof: Burden: Equity Rule.** The burden of proving undue influence is on the party alleging it; and, like other questions of fraud and bad faith, undue influence is a question of fact, which can rarely be proved by direct or positive evidence, but may be established by facts and circumstances, and upon grounds of public policy the doctrine of courts of equity has been adopted by courts of law as a guide in will contests.

3. ———: ———: **Fiduciary Relation: Presumption.** Where a devise or legacy has been given by a testator to one occupying a fiduciary relation to him, proof of the existence of such a relation raises the presumption of undue influence, which will be fatal to the bequest unless rebutted by proof of free deliberation and spontaneity on the part of the testator, and good faith on the part of the legatee.

4. ———: ———: ———: **This Case.** Testatrix died possessed of about $18,000 worth of property, leaving three children, to one

of whom she gave $1,000, to another, a daughter, $1,500, and to the third, defendant, the balance. She was at the time of the execution of the will seventy-seven years old. The property she had received from her husband, who died a few years previous to its execution. She had been frail and in feeble health for years, and during his life had had nothing to do with business affairs. After his death her business affairs were wholly managed by her sons, and for sometime prior to the execution of the will almost entirely by. defendant. A year or two previous to the execution of the will in suit she had made another, by which, one son says, the three children were given equal shares, and which the defendant says was practically the same as the one in suit. The defendant says he copied that will, making the changes his mother desired therein, had it copied by a typewriter before she saw it, and she signed it immediately on its presentation to her, in the presence of defendant and the witnesses whom he had taken to the house where she was boarding for the purpose of witnessing it, and that then he destroyed the other will, he says at her request. He had no conference with her about the changes she desired to make in the will, and she made him no oral explanation of the changes desired prior to executing it, but he says she informed him by letters of the changes she desired made, but he did not produce those letters, although he said he had them in his possession. At the time the last will was executed defendant held a power of attorney from testatrix to control all her business affairs; he was estranged from his sister, and had persuaded his mother to believe that the daughter and her husband were living off of her estate, which was totally untrue, and her mother had also become estranged from the daughter; when the mother's agent had made an advantageous sale of unproductive property, she declined to sign the deed until defendant would consent, and she appealed to a friend to persuade defendant to let her sign it; and when she desired to aid the other two children she sought to keep defendant from knowing it, lest he would raise a disturbance about it. *Held*, that defendant bore a fiduciary relation to testatrix; that he had acquired a strong control of her mind as to the disposition of her property; and that the facts are sufficient to uphold the finding of the jury that the will resulted from defendant's undue influence.

5. ———: ———: **Discrimination.** Discrimination in favor of one child over another is not of itself evidence of undue influence; but when other evidence of undue influence is produced and the favored child prepares a will by which he obtains the bulk of his parent's estate, the burden is on him to show that the will is the result of deliberation and spontaneity on the part of the testator and absolute good faith on his part.

Appeal from Jefferson Circuit Court.—*Hon. Frank R. Dearing,* Judge.

AFFIRMED.

*R. A. Frazier, J. G. Williams* and *James F. Green* for appellant.

(1) A jury has no right to alter the disposition of the testatrix's property simply because they may think she did not do justice to her family, and this rule applies with equal force to the courts. Hughes v. Rader, 82 S. W. 54; Tibbe v. Camp, 154 Mo. 545; Berberet v. Berberet, 131 Mo. 411; Lorts v. Wash, 175 Mo. 502. (2) The settled meaning of "undue influence" in this State is such influence as amounts to over-persuasion, coercion or force, destroying the will-power of the testator. Hughes v. Rader, 82 S. W. 54; Morton v. Bowdern, 158 Mo. 379; Campbell v. Carlyle, 162 Mo. 634; Tibbe v. Camp, 154 Mo. 545; Southworth v. Southworth, 173 Mo. 59; Wood v. Carpenter, 169 Mo. 465; Riggin v. Westminster College, 160 Mo. 570; Sehr v. Linderman, 153 Mo. 276; Cash v. Lust, 142 Mo. 630. (3) It is not the existence of undue influence, but the exercise of it in the execution of a will, which invalidates it. There is no evidence whatever in the record of fraud or deception practiced upon Mrs. Rankin, and, in the absence of such evidence, the will ought to stand. Crowson v. Crowson, 172 Mo. 703; Thompson v. Ish, 99 Mo. 160; Kishman v. Scott, 166 Mo. 214; Wood v. Carpenter, 166 Mo. 465; Brinkman v. Reugsick, 71 Mo. 553. (4) There was no sufficient evidence of undue influence, and in the absence of substantial evidence of incompetency or undue influence, the case should not have been submitted to the jury. Hughes v. Rader, 82 S. W. 54; Berberet v. Berberet, 131 Mo. 399; McFadden v. Catron, 138 Mo. 197; Maddox v. Maddox, 114 Mo. 35; Kishman v. Scott, 166 Mo. 215; Defoe v. Defoe, 144 Mo.

458; Sehr v. Linderman, 153 Mo. 289. (5) The court erred in refusing to give instruction 13 for defendant, and also in refusing to give instruction 9 offered on part of defendant. Carl v. Gabel, 120 Mo. 283; Campbell v. Carlyle, 162 Mo. 634; Tibbe v. Camp, 154 Mo. 580; McFadin v. Catron, 138 Mo. 213; Riley v. Sherwood, 144 Mo. 366; Aylward v. Briggs, 145 Mo. 613; Hughes v. Rader, 82 S. W. 32.

*Sam Byrns* and *E. J. Bean* for respondent.

(1) The instructions were stronger in favor of appellant than warranted by law. The onus is on the party alleging the undue influence to prove it. Under the facts in this case, when it was shown that undue influence existed and that the mind of the testatrix was in a state of vassalage to E. C. Rankin and that he received the greater part of the estate in a will prepared by himself, then the burden of proof shifted to the defendant to show the fairness of the transaction. Gay v. Gillilian, 92 Mo. 250; Carl v. Gabel, 120 Mo. 297; Lins v. Lenhardt, 127 Mo. 282. (2) There was ample evidence of undue influence on which to submit the case to the jury. Bush v. Bush, 87 Mo. 481. (3) Direct evidence of undue influence is not required. It may be proved by facts and circumstances. Schouler on Wills (2 Ed.), par. 242; Moore v. McDonald, 61 Md. 340. (4) Defendant's demurrer to the evidence was properly overruled. Twohey v. Fruin, 96 Mo. 104; Gannon v. Gas Co., 145 Mo. 516; Gordon v. Burrus, 153 Mo. 223; Hughes v. Rader, 82 S. W. 32. (5) This court will not interfere with the verdict on the question of the weight of evidence, as that was for the jury. Appleby v. Brock, 76 Mo. 315; Young v. Ridenbaugh, 67 Mo. 589. (6) A radical change in the will tends to show indue influence. Voorhees v. Voorhees, 39 N. Y. 463; In re Bernsee's Will, 17 N. Y. 671. It is a suspicious circumstance that the principal beneficiary writes

the will, and undue influence may be inferred therefrom. Yardley v. Cuthbertson, 108 Pa. St. 395. (7) The manner of executing the will was a badge of fraud. Baldwin v. Whitcomb, 71 Mo. 659.

GANTT, J.—This is an action instituted in the circuit court of Jefferson county, Missouri, at the January term, 1902, for the purpose of contesting the last will of Cecilia A. Rankin, deceased.

The petition is as follows:

"Plaintiff states that she is a child and heir at law of Cecilia A. Rankin, deceased, and as such is interested in her estate; that deceased was a single woman and departed this life in Jefferson county, Missouri, on the — day of April, 1901, possessed of a large estate of real and personal property; that her heirs at law are Charles T. and Eugene C. Rankin, defendants herein, and this plaintiff; that thereafter, to-wit, on the 17th day of May, 1901, there was admitted to probate by the probate court of Jefferson county, and within five years from this date, a certain instrument in writing as and for the last will and testament of Cecilia A. Rankin, deceased, and bearing date August 17th, 1899, and that letters testamentary thereon were on the — day of ——, 1901, granted by said probate court to said Eugene C. Rankin as executor named in said supposed will; that by the supposed will plaintiff and defendants herein were made legatees.

"Plaintiff further states that at the time the said supposed will was subscribed by the said Cecilia A. Rankin, in her lifetime, and also at the time the same was published and declared as and for her last will and testament, said Cecilia A. Rankin was not of sound mind and disposing memory, but on the contrary, was wholly incapable of making a testamentary distribution of her affairs.

"Plaintiff further says that, at the time said supposed will was executed by Cecilia A. Rankin, she was

under the control of the defendant Eugene C. Rankin; that he possessed and exercised undue influence over her, and that the will and the mind of the said Cecilia A. Rankin was controlled and dominated by said Eugene C. Rankin, and that he caused his will to be substituted and his intention carried out in said will for that of Cecilia A. Rankin, deceased.

"Plaintiff says that by fraud and artifice resorted to and practiced by the said Eugene C. Rankin on Cecilia A. Rankin he induced her to attempt to make a will; that the supposed will was the result of the weak and unsound mind of the said Cecilia A. Rankin unduly controlled by the undue influence and fraud of the said Eugene C. Rankin, and that said will is not her own free act and deed, and that said writing is not the last will and testament of the said Cecilia A. Rankin, deceased.

"Plaintiff, therefore, prays that an issue be made up whether said writing produced and admitted to probate as aforesaid, be the last will and testament of Cecilia A. Rankin, deceased, or not, and that the same be set aside and for naught held and that plaintiff recover her costs in this behalf expended."

Defendant Eugene C. Rankin filed his answer as follows:

"Now at this day comes defendant Eugene C. Rankin, and for his answer to plaintiff's petition denies that the said Cecilia A. Rankin, testatrix, was not of sound mind and disposing memory at the time of executing the last will and testament in plaintiff's petition described and contested herein, and further answering denies that at the time said will was executed by Cecilia A. Rankin she was under the control of the said defendant Eugene C. Rankin, and denies that he possessed and exercised undue influence over her and denies that the will and mind of the said Cecilia A. Rankin was controlled and dominated by him, the said Eugene C. Rankin, and denies that he caused his will to be

substituted and his intentions carried out in said will for that of Cecilia A. Rankin, and denies that the said will was not her own free act and deed and denies that the said defendant, Eugene C. Rankin, resorted to any fraud or artifice of any kind whatever, and denies that he induced her to make a will, and denies that the said will was the result of the weak and unsound mind of the said Cecilia A. Rankin, unduly controlled by the undue influence and fraud of the said Eugene C. Rankin, and denies that the said writing is not the last will and testament of said Cecilia A. Rankin, deceased, and denies that she was incapable of making a testamentary disposition of her affairs.

"Defendant Eugene C. Rankin states the fact to be that the said Cecilia A. Rankin was at the time of the execution of the said last will and testament by her of sound mind and disposing memory; defendant further states that the said Cecilia A. Rankin departed this life on or about the 17th day of April, 1901, and that on the 7th day of May, A. D., 1901, the said will was duly admitted to probate by the probate court of Jefferson county; and that the last will and testament was the free act and deed of the said Cecilia A. Rankin and the untrammeled disposition of her property to the therein mentioned objects of her bounty.

"Wherefore, the defendant prays the court that the last will and testament of the said Cecilia A. Rankin be declared and established as her last will and testament."

The action was dismissed as to the executor of the will, and defendant Charles T. Rankin filed his answer as follows:

"Now at this day comes Charles T. Rankin, one of the defendants in the above entitled cause, and for answer to plaintiff's petition filed herein, admits each and every allegation in said petition contained."

The cause was tried before the court and a jury. The jury returned a verdict that the paper writing pro-

pounded was not the last will and testament of said Cecilia A. Rankin.

Motions for a new trial and in arrest of judgment were duly filed, heard and overruled, and the defendant Eugene C. Rankin appealed to this court.

On the trial the defendant, Eugene C. Rankin, offered evidence of the due execution of the will.

Perry Bartholow testified that he had lived in the city of St. Louis since 1873, and was at the time of testifying assistant superintendent of supplies of the Louisiana Purchase Exposition Company; and prior to that time had been United States Consul to Germany; that he had known Mrs. Rankin since 1878, having married her niece in that year. He identified his signature as a witness to the will, and stated that he signed the same at her request; that Mrs. Rankin read the will and signed it, and the witness asked her if it was her last will, and if she wanted him to sign it as a witness, and she said "yes," and he did so; that at the time there were present in the room Ed Fletcher, Eugene Rankin, the testatrix, Mrs. Rankin, and Max Seaman. The will was executed on the 17th of August, 1899; that Mrs. Rankin at that time was in good health, but was an old woman; that he had often seen her since the death of her husband, and prior to the signing of the will; that at the time of the execution of the will she was a very strong-minded woman of fine education and refinement; that at that time Fletcher, the other witness, who was her nephew, boarded in the same house with her. On cross-examination he stated it was about eleven o'clock in the day when the will was executed; that Gene Rankin had written him that he would come up and wanted to see him; that they had a typewritten copy of the will; that they went out to the house where Mrs. Rankin was staying in the city, and that he went upstairs and called her to come down and get through with the will, so that they could go down town; that Mrs. Rankin read the will and said that was what she

wanted; that Mrs. Rankin lived in De Soto or boarded there, and that she had been in St. Louis about six weeks or two months, came up there about the 4th of July; that he went out to the house for the purpose of witnessing the will; that the will was typewritten by a Mr. Jenkins in the Laclede Building. Jenkins was the witness's stenographer; that he, Bartholow, told Eugene Rankin to get a stenographer to write the will; that Rankin had a rough draft of it when he came into the office; that he had had it typewritten, and then they went out to the house and Fletcher was there; that Mrs. Rankin wrote her name to the will in the parlor in the presence of them all, and that witness asked her if that was her last will, and if that was what she wanted, and she said it was; that the notary asked her about the same question that he did, viz., if that was her last will; that Mrs. Rankin had told witness that she was going to have a will made, and had told him that she was going to leave her property to Eugene, her son; that if she did not do that it would be thrown away and squandered; that if she gave it to Mrs. Dausman (her daughter) it would be given to Dausman and that he would throw it away, and that she was not going to give Charley, her son, any more to squander; that if she gave it to Charley he would not have a dollar in three months; that Mrs. Rankin at that time was seventy-three years old, was not very strong physically and could not stand much exercise; but her mind was very clear; that Eugene Rankin's treatment toward his mother at the time his father died was such as a son's should be toward his mother. In regard to drinking he said he had seen Eugene C. Rankin full pretty often before and since his father's death; that he was sober about as long as he was drunk during the past thirty years. He had reformed about a year before this will was written.

Ed Fletcher testified he signed the will as a witness for Mrs. Rankin; that he was boarding with his

aunt there at the time, and she asked him to sign the will as a witness, and said it was her last will, and she wanted to leave her property that way; that he asked her when she signed it if she knew what she was signing, and she said she did, that she had left her property as she wanted to; that the condition of her mind was all right, and she knew what she was doing. On cross-examination he stated that he had been down to the butcher shop and when he came back Eugene Rankin and Perry Bartholow were there and he went in and witnessed Mrs. Rankin's signature; that the execution of the will occurred between ten and eleven o'clock on that day; that a notary public had the will when witness first saw it, and that the notary laid the will on the table; that at that time Mrs. Rankin was sitting in the room and the notary asked her if she knew what was in the will, and if she had read it, and whether it was all right, and she told the notary that she knew everything there was in there and that it was all satisfactory. He did not remember what was done with the will after it was signed, he did not see it any more until he made the affidavit as a witness after Mrs. Rankin's death; that he signed the will in the presence of Bartholow and was there when Bartholow signed it as a witness; that Mrs. Rankin was over twenty-one years of age and of sound mind when she signed it.

Having made this formal proof of the execution of the will the defendant offered and read in evidence the said will which is in words and figures as follows:

"I, Cecilia A. Rankin, being of sound and disposing memory, do make and declare and publish this my last will and testament, hereby revoking and annulling all former wills by me made, as follows:

"1st.    I order and direct that all of my just debts be paid with convenient speed out of my personal estate if possible.

"2nd. I give, bequeath and devise unto my son, Eugene C. Rankin, all of lots eight, nine, ten, eleven and twelve in block three known as the "Rankin House," in De Soto, Missouri, being the same left me by my husband, L. J. Rankin, deceased. Also the silverware and all the books and pictures of every description and kind wherever located, and also one-half interest in all my personal property and real estate of whatever nature, in my possession at the time of my death.

"3rd. I give and bequeath unto my son, Charles T. Rankin, one-fourth of my estate, both real and personal, provided that he shall be frugal and saving from this date on; otherwise, he shall receive one thousand dollars and no more, and should he be dead at or before my death, the above to go to my other children, excepting one dollar each to Mattie and L. J. Rankin, Jr., children of the above named Charles T. Rankin.

"4th. I give and bequeath unto my daughter, Maggie C. Dausman, one thousand five hundred dollars worth of real estate or in cash, at the option of the other heirs. She to have and to hold the same as her separate property, and her husband, W. H. Dausman, is not to have any right, title or interest or curtesy therein, but this to be hers, separate and distinct, as though she was single and unmarried, and at her death the same to go to her children with the same restriction as above set forth.

"5th. The remainder of my estate, if there be any, I give and bequeath to my son, Eugene C. Rankin.

"6th. I hereby appoint my son, Eugene C. Rankin, my executor, without bond, of this my last will and testament.

"Dated this 17th day of August, 1899.

                    "CECELIA A. RANKIN.

"Signed and published and declared by the above Cecelia A. Rankin to be her last will and testament, in

the presence of us, who, at her request, and in the presence of each other, and in her presence have subscribed our names.                    ED. L. FLETCHER,

                                    "PERRY BARTHOLOW.

"State of Missouri, City of St. Louis, ss.:

    "On this 17th day of August, 1899, before me personally appeared Cecelia A. Rankin, to me known to be the person described in and who executed the foregoing instrument, and acknowledged that she executed the same as her free act and deed.

    "And the said Cecelia A. Rankin further declares to be a widow and unmarried.

    "In testimony whereof, I have hereunto set my hand and affixed my seal at my office in the city of St. Louis, the day and year first above written.

    "My term of office expires September 11, 1900.

                                    "M. J. SEEMAN,

                                    "Notary Public."

    Thereupon the defendants rested their prima facie case.

    The plaintiff then offered in evidence the inventory of Mrs. Rankin's estate made by her son, Eugene C. Rankin, from which it appears that she had real estate valued at about eighteen thousand dollars and personal property at the value of three hundred and fifteen dollars.

    Mrs. Maggie Dausman testified she was a daughter of L. J. Rankin and Mrs. Cecilia A. Rankin, and was living in Moberly, Missouri, and the wife of W. H. Dausman; in 1899, in August, she was living in De Soto. Her father had been dead about five years and her mother died in April, 1901; that her mother kept house until witness married, and after that boarded; 'that at the time of her mother's death witness was living in Webster Groves; was present with her mother in her last sickness; was telegraphed for and came and stayed with her during her last sickness which lasted about three weeks; her mother was seventy-eight

years old at the time of her death, and had been in poor
health for years; that she took the death of her husband
very hard, and her health was much worse after his
death; that her mother had no business capacity, and
she never knew her to transact any; that she had no
idea of her estate and had never had any estate until
the death of her husband; that she did not know the
value or the number of the houses she owned; that she
was incapable of giving the list of her property to the
assessor; that she did not know who her tenants were;
she knew that she owned the Acme Hotel, the Grove
and the old homestead property, but some of the little
houses she did not remember at all; that the relation
of Gene and her mother was very intimate; that he con-
trolled her business, and she never did anything with-
out consulting him; that her mother visited her and was
very kind to her up to her father's death except the
first two or three weeks after her marriage; that she
was invited home by her mother, that she and her hus-
band went and that deceased seemed satisfied, and all
the family treated her well except Eugene; he did not
speak to her for eight years; that right after her
father's death she noticed a change come over her
mother towards herself, her visits were not so frequent,
and she finally ceased visiting her entirely until she
moved to De Soto; that there was never any trouble be-
tween them to cause this, but her mother gradually
grew cold towards witness. During this time Eugene
was her confidant; that for nineteen months before her
mother's death she lived in Webster Groves fourteen
miles out from St. Louis, and that her mother never
visited her there, though she was in her usual health
and visited St. Louis a month or so at a time; that she
visited her mother at De Soto for three days the week
before she was taken down with her fatal sickness;
that her mother called Eugene to come in and see her,
but he refused and did not see witness while she was

Vol 189 mo—44

there; that she went home on Monday and her mother was taken sick Friday. Eugene then sent for her and she came and remained until her death and funeral; that immediately after the funeral and while at the station Eugene did not speak to her or tell her good-bye; that she told Eugene that she would like to give her Aunt Clara some of her mother's clothes, but he said, "Put them in the trunk and give me the key." My mother's watch and some silverware were in the trunk, the clothes and wearing apparel were her mother's and witness was the only daughter. After her father's death she had a talk with her mother about a will she had made; she told witness the contents, and she said she had left my daughter a house and had left another daughter a house; that she left my daughter Cecilia her watch; that while they were taking the goods Mrs. Deadrick told Gene that he had his father's watch, that Mrs. Rankin intended her watch to go to Maggie's daughter Cecilia, but he said, "No, put it in the trunk;" that the witness had a family of five daughters; that when she moved to De Soto she moved into the old home place; that her mother, Gene and Charley had a talk with her and all said they wanted her to have that place, Charley said she was welcome to his interest, and they were to let her have the house without rent; that Gene charged her sixteen dollars per month and deducted it out of her share of her father's estate; that just before Gene went to St. Louis witness and her mother were in his room at the Acme Hotel in De Soto and he produced a will which purported to have been made by him and handed it to the witness and said, "Read this," and she was reading it to herself and he said, "Read it aloud." It was admitted that the attorneys had notice to produce this will, but they did not have it. This will, as witness remembered it, stated that, "I, Eugene C. Rankin, being of sound mind do will and bequeath to my mother Cecilia A. Rankin all of my possessions, knowing that she will make a proper disposition of them." Her

mother was then seventy-six years old and Gene about forty-five and in good health; that he had always lived at home except a short time when he had positions in St. Louis; that for the last fifteen years he had not done anything that she could learn; she stated that the time that Gene showed her this will of his was in the spring of 1899 and there were no witnesses to it.

Mrs. Lattie J. Pratt testified that she heard Mrs. Rankin say, "There was one thing sure, that when she died, Maggie's children would be well provided for." She said that two or three times just before she was taken sick, she said she did not want Will Dausman to get her money and that what she did for Maggie she did not want Eugene to know; she was very forgetful, always had some one with her in going about the streets of De Soto, her business capacity was very poor, her objection to Mr. Dausman was not on account of his drinking, but Maggie's children increased too often; that that was her objection to him.

Otto Hermann testified that he knew Mrs. Rankin, and that he never knew her to do any business; that Gene managed her business; that she had valuable property on Main and Boyd streets in De Soto, stores, hotel and residence property; that he never heard of her transacting any business in regard to them.

Mr. Blackman testified, on part of plaintiff, that he lived in De Soto and had a piece of property belonging to Mrs. Rankin for sale in 1899 and sold it to Mr. Shuman for six hundred and fifty dollars; had an office with Charles Rankin, and he placed it in his hands for sale. The deal was closed, but Mrs. Rankin did not make this deed; that Gene objected to it being sold, and Mrs. Rankin asked him to see Gene and ask him to allow her to sign the deed; that he asked Gene why he did not allow his mother to sign the deed, and Gene said he was going to sell it himself, thought he could sell it for more money, but witness said, "You had better let your mother sign the deed," and Gene said he would. Gene

generally made out the tax list for her property and had charge of her papers.

Dr. James Deadrick testified for the plaintiff; that he married a niece of Mrs. Rankin, knew her quite intimately, did not think she had business capacity, she was a woman of strong prejudices; she did not like Will Dausman, the husband of her daughter.

Charles T. Rankin testified that he did not learn of the contents of the present will until the day the partition was served on him in this case; that he knew of another will besides this, one which had previously been made by his mother; that that will was in his mother's possession. He was asked to state the provisions of that will, to which defendant objected. E. C. Rankin was then called for the plaintiff and asked if he had in his possession a will purported to have been executed by Cecilia A. Rankin prior to the will in controversy, and he said that he had not, that it had been destroyed; that that will was prepared in 1897. Thereupon Charles T. Rankin was recalled and testified that under the provisions of that former will his mother made all the children equal; that she gave to his sister's oldest daughter a watch and house and lot, and to Nettie, the second daughter, some property; that when he heard of this will being contested he thought it was the will that his mother had told him she had made and was surprised at his sister contesting it. Mr. Williams, the attorney, wrote him a letter and told him about the suit having been brought against himself and Eugene, and of his having employed Mr. Frazier to represent him and that he wrote Frazier and told him to file an answer; at that time he had given his brother Gene a deed for part of the property; that his mother did not attend to business after his father's death. Witness attended to it and filed all the papers in her statement of his father's estate; that she did not do anything in controlling the property; she gave brother Gene the power of an attorney to attend to her business; she would do nothing

without consulting Gene, would not sign papers without consulting him.   He also related the circumstances about Capt. Blackman selling the lot and stated that his mother did finally sign a second deed and that witness got some money from the German-American Bank, he had a law suit at Hillsboro, and it took nearly all of his money, and his mother indorsed the note for him at the bank, but said she did not want Gene to know about it, for he would raise a row; that she did business with the People's Bank of De Soto; the money was borrowed from the German-American Bank.   Mrs. Rankin's property consisted of some twelve houses, most of which were rented, the rental amounting to about $175 or $200 per month.   Gene rented the property and collected the rents; witness did not think that his mother knew the value or extent of her property.   Part of the time witness attended to the property and afterwards his brother did.   On one occasion, when Gene, his mother and the witness were present, and his sister was thinking of moving to De Soto, witness told her he would give her his interest in the homestead property and his mother said she would give her hers, and his mother insisted on Maggie moving down to De Soto; that Gene said, "We will see about it." Witness owned one-fourth interest in the property.   Maggie came down and lived there awhile, but the deed was not made to her; that he was present at the last sickness of his mother; his sister, Mrs. Dausman, was there attending to his mother for several weeks before she died; whenever she was out of the room her mother wanted her back again.   On cross-examination he was examined as follows: "Q. You stated awhile ago that your mother had made a prior will." Ans. "Yes, sir." Q. "Who drew it?" Ans. "I think Mr. Williams." Q. "Who were the witnesses to that will?" Ans. "I cannot remember." Q. "what was the date of it?" Ans. "I do not know as to the date." Q. "What was the manner of the disposition of the property under the will?" Ans. "She

left it as I said: we were to share and share alike." Q. "Did you ever talk with your mother about the execution of that will?" Ans. "Yes, sir at different places, and she has talked to me about it at my office." Q. "Is not it a fact that Gene was to get the Rankin house?" Ans. "No, sir." Q. "Have you not heard your mother say a number of times that she wanted Gene to have that hotel property?" Ans. "No, sir, she said she wanted to do as my father had done, make us all equal."

At the close of the plaintiff's evidence in chief the defendants asked an instruction in the nature of a demurrer to the testimony, which was by the court overruled. The defendants then called Dr. W. H. Farrar, a physician who had lived in De Soto since 1878, and was the family physician of Mrs. Rankin in her lifetime. He testified that she was a very strong-minded woman and very intelligent; that during the year 1899 up to her death he considered her mind active and strong. On cross-examination he stated that he did not know of her transacting business; that she was a feeble woman physically, and a woman of strong prejudices; that she would not be easy to turn against anyone, but if she made up her mind that way it would be hard to change her; she was very feeble before her husband's death and when the body fails the mind usually fails with it. Witness saw Mrs. Dausman waiting on her mother during her last illness; her mother seemed to have every confidence in her; Mrs. Dausman waited on her day and night.

Dr. Auerswald testified that he had known Mrs. Rankin since 1880, saw her a short time before her death; she was a strong-minded woman, and in his opinion capable of disposing of her property. He stated that he had been at Mrs. Rankin's house a number of times when her husband was sick, and as a rule a person seventy years old, feeble in body and of strong prejudices, was susceptible to the influence of others.

Mr. Manheimer and his wife testified also that Mrs. Rankin was a woman of strong mind and very decided.

Mr. Crow testified that he had known her intimately for about eleven years, and in 1898 had a conversation with her; she came into witness's office and asked where Gene was; witness said, "I suppose he has gone out to get a drink," and she said, "No he has not," and said as long as Gene stayed there and took care of her he should have charge of her property, and that if he would get married she would will it all to him. He thought she was a woman of sound mind, and very intelligent. On cross-examination he stated that he was a friend of Gene's, they had hunted together many times, and had an office in the same building. Gene Rankin had the management of Mrs. Rankin's property, so far as he knew, and she had utmost confidence in him.

Dr. Bryan testified he had known Mrs. Rankin for twenty years and she visited his family; she was a woman of over average intelligence; she told him in 1898 that she was going to leave her property to Gene, because he would take care of it and would not drink it up, and as he was taking care of her he was entitled to it; that Charley had had enough, had had his share and drank it up. On cross-examination he stated this conversation was in consequence of Gene's ceasing to drink, and occurred at his store; that he had treated Gene for pneumonia and for the liquor habit at the request of his mother.

Mr. Park also testified that she was a bright woman, of excellent character. Witness on one occasion made a remark that he believed in people holding on to their property as long as they lived and not letting their children have it, but she said it will be all right if you give it to a party that would take care of it.

L. J. Deering had known Mrs. Rankin for several years; she had boarded with him about two months in

1899. She said in his presence on one occasion if Gene outlived her he would have all she had; that Charley had sold his interest in the real estate, and her daughter's husband had lived off of her estate long enough; that she would leave all she had to Gene.

Mrs. Hunter testified to about the same effect as did Mrs. Deering and Mrs. Fletcher.

The defendants then called Eugene C. Rankin as witness for himself. He testified his father died in 1897 and his estate was settled in 1899; that he and his mother bought the interest of his brother Charles in the real estate; that they also wanted to buy Mrs. Dausman's interest in partnership, but that on July 31, 1900, Mrs. Dausman sold her interest to George Mahn; that Mr. Joseph G. Williams, one of the attorneys in and present at the trial of this case, drew the will which his mother made in June, 1899; that the will was changed at his mother's special request; that under that will he was to receive the Rankin hotel property and one-fourth of the estate, and his brother one-fourth provided he would live a frugal life and stop drinking, and his sister was to receive one thousand dollars in money and a piece of property valued at four or five hundred dollars free from the control of her husband; that that is the only difference between the old and the new will; that after the new will was made she remained in St. Louis, and had been there some two months before, at 2846 Lafayette avenue, at Mrs. Honey's boarding house; that he saw her about every two weeks while she was there; that when she returned to De Soto she went to Mrs. Hunter's to board. On cross-examination he said he did not know the day of the month on which the June will was made; that it was destroyed at his mother's request after she had made her last will; that he destroyed it as soon as he got home from St. Louis; that he thought the last will was written on the 15th of August, 1899.

The following questions and answers were then propounded to him by plaintiff's counsel:

"Q. Did she write to you? Ans. Yes, sir. Q. If she wrote to you have you those letters? Ans. I think I have them at home. Q. Did she indicate to you how she wanted that will changed in those letters? Ans. She told me to come up and she would explain it. Q. When did you go up? Ans. The day the will was signed. Q. On what train? Ans. The Arcadia. Q. Did you have a draft of the will with you? Ans. Yes, sir, I made a copy of the old will. Q. That is the will? Ans. Yes, sir. Q. Now this will reads, 'I give and bequeath to my son, Eugene C. Rankin, all of lots 8, 9, 10, 11 and 12 in block 3, known as the Rankin house, in De Soto, Missourri, being left me by my husband, L. J. Rankin?' Ans. Yes, sir. Q. 'Also all the silverware, books and furniture and also one-half interest in all my personal property at the time of my death?' Ans. Yes, sir, that is a correct copy of the June will. Q. And the third clause is, 'I give and bequeath to my son, Charles T. Rankin, one-fourth of my estate, both personal and real, provided he shall be frugal and saving from this day on, otherwise, he shall receive $1,000 and no more, and should he be dead at or before my death the above to go to my other children, excepting $1 each to Mattie and L. J. Rankin, Jr., children of the above Charles T. Rankin;' is that the same? Ans. Yes, sir. Ques. The fourth clause reads this way: 'I give and bequeath unto my daughter, Maggie Dausman, $1,500 worth of real estate or in cash at the option of the other heirs. She to have and to hold the same as her separate property and her husband, W. L. Dausman, is not to have any right, title, interest or curtesy therein, but this is to be hers separate and distinct as though she were single and unmarried and at her death the same to go to her children with the same restrictions as above set forth.' What is the difference between this clause and the June will? Ans. She was to

get $1,000 and a house and lot up on the hill, I think well worth $450. *And in order to avoid controversy she was to have $1,500 or that amount of property.* The fifth clause of this will and the June will are just the same.'' He further testified that he never talked to his mother about making a will; that he and his mother were buying this property together, that he represented himself and his mother in the transaction.

Defendant also offered in evidence a deed from Charles Rankin to Mrs. Rankin and Eugene Rankin for his one-fourth interest in his father's estate, and another executed April 23, 1901, by which Charles Rankin conveyed to Eugene Rankin all his interest under the will of Cecilia Rankin to certain property therein described. Defendant also offered in evidence the last will of Louis J. Rankin, by which he gave to his widow Cecilia Rankin certain lots in De Soto, and divided the balance of his estate in four equal parts between his widow and his three children. It was admitted that if Joseph A. Hammond were present he would testify that he copied the will executed in June by Cecilia A. Rankin on a typewriter; that the will was written by Joseph G. Williams, and contained the exact words of the will now in contest with the exception that it gave Mrs. Dausman one thousand dollars in cash and a house and lot in the city of De Soto.

At the close of the evidence the court gave the following instructions for the plaintiff:

"1. The court instructs you that the question you are to determine in this case is whether or not the paper writing offered in evidence dated August 17, 1899, as the last will and testament of Cecilia A. Rankin, was the result of undue influence used upon said Cecilia A. Rankin by Eugene Rankin in procuring the execution of said paper writing; and if you find from the evidence that said paper writing was the result of undue influence exercised by Eugene C. Rankin over Cecilia A. Rankin, then you will find your verdict against

the will and in favor of the plaintiff, although you may believe from the evidence that she signed it as such and the witnesses attested it as such.

"2. By the term 'undue influence,' as used in these instructions, is meant the exercise of such power and influence by one person over the mind of another as would result in the subjugation of the mind of the one to that of the other and the complete subjugation of the will of the one for the will of the other in the matter in which they were engaged; and if the jury believe from the evidence in the case that by reason of the weak and feeble mind of said Cecelia A. Rankin, said Eugene C. Rankin was enabled to, and did exert such an influence over the mind of said Cecelia A. Rankin as to substitute his will and wishes for that of Cecilia A. Rankin, in the disposition of her property by will, and if the signing of said paper by said Cecelia A. Rankin was induced and brought about by the exercise of the influence, then the jury will find that said paper is not the will of said deceased Cecelia A. Rankin, notwithstanding that said Cecelia A. was at the time said paper was signed and attested, of sound mind and disposing memory.

"3. The court instructs the jury that it is not necessary that undue influence should be proved by direct and positive testimony; but the same may be proven by facts and circumstances; and, in passing on the question as to whether the signing of the paper in question by Cecilia A. Rankin was induced by influence on the part of Eugene C. Rankin, it is proper for the jury to take into consideration the terms of the will itself; the relation of Cecelia A. Rankin to the plaintiff, as shown by the evidence; her age, mental and physical condition, as shown by the evidence; her relation to and feeling toward the defendants, Charles T. Rankin and Eugene C. Rankin, as shown by the evidence, as well as other facts and circumstances disclosed by the evidence in the case, and if from all the facts and circumstances

the jury believe that the signing of the paper in controversy by said Cecelia A. Rankin was induced and brought about by an undue influence on the part of said Eugene C. Rankin, as an undue influence has been defined in these instructions, then it is the duty of the jury to find that the said paper is not the will of the said Cecelia A. Rankin.''

To the giving of which instructions the defendant excepted at the time.

The court, at the instance of defendant, gave to the jury the following instructions:

''2.   The court instructs the jury that there is no evidence that Cecelia A. Rankin was, at the time she made the will, of unsound mind and incapable of making said will, and you cannot find against the will produced on that issue.

''3.   The court instructs the jury that there is no evidence as to the charge of fraud on the part of Eugene C. Rankin, and you cannot find agaist the will produced on that issue.

''4.   The court instructs the jury that Cecelia A. Rankin had the right to will the property to anyone she desired to and even had a right to make an unreasonable, unjust and injudicious will, and you have no right to alter the disposition of her property simply because you may think that Cecelia A. Rankin did not do justice to her family.

''5.   The court instructs the jury that by undue influence is meant such influence as amounts to force, coercion or over persuasion which destroys the free agency and will power of the testator.

''6.   The court instructs the jury that Cecelia A. Rankin had the right to dispose of her property by will in such manner and to such persons as she deemed proper and the beneficiaries in such will are not required to account for or explain such disposition, and if you find that said Cecelia A. Rankin did execute the instrument on the 17th day of August, 1899, then the

plaintiff can only avoid such will by showing to your satisfaction by a preponderance or greater weight of evidence that said will was procured by undue influence on the part of Eugene C. Rankin.

"7. The court instructs the jury that any degree of influence over another acquired by kindness and attention can never constitute undue influence. within. the meaning of the law, and although the jury may believe from the evidence that the deceased Cecelia A Rankin, in making her will, was influenced by any person or persons, still if the jury further believe from the evidence that the influence which was exerted was only such as was gained over the deceased, Cecelia A. Rankin, by kindness and friendly attention to her and not such as to destroy her free agency and make the will not hers but that of such person, then such influence cannot be regarded in law as undue influence and a verdict on this ground should be in favor of the will.

"8. The court instructs the jury that undue influence as defined in these instructions, sufficient to set aside the will in question, must be an influence exerted and used over the mind of the said Cecelia A. Rankin prior to the execution of said will, and at the time of its execution, and unless you find that such undue influence was weilded over her at the time of the execution of said instrument, the will in question will be the last will of the said Cecelia A. Rankin."

I. The instructions of the court reduced the issues in this case to one, to-wit, whether the paper writing propounded as the will of Mrs. Rankin was the result of undue influence exerted upon her by her son, Eugene C. Rankin. The court by a peremptory instruction told the jury there was no evidence that Cecelia A. Rankin was, at the time she made the will, of unsound mind and incapable of making said will, and therefore they could not find against the will on that issue. This instruction renders it wholly unnecessary on this appeal to discuss whether Mrs. Rankin had sufficient testamentary ca-

pacity to make a valid will. The one question, then, which we are called upon at this time to determine is whether there is sufficient evidence to sustain the verdict of the jury which declared that the paper writing propounded as such was not the last will and testament of Mrs. Rankin. Counsel for appellant assigns as error the refusal of the circuit court to give instruction numbered 13 and 9 as prayed by the defendant, which were as follows:

"9. The court instructs the jury that there is no evidence as to the charge of undue influence on the part of Eugene C. Rankin, and that you cannot find against the will produced on that issue.

"13. The court instructs the jury that if you believe and find from the evidence that Cecelia A. Rankin signed the will in the manner testified by the subscribing witnesses and that at the time of such signing she had sufficient understanding and intelligence to understand what disposition she was making of her property, the nature and extent of her property, and to whom she was giving it, then the jury will find that she had sufficient capacity to make a will, and that said will is the last will and testament of said Cecelia A. Rankin, unless you further find from the testimony that the making and signing of said will was procured by defendant, Eugene C. Rankin, by undue influence which amounted to a moral force or coercion, destroying the free agency of Cecelia A. Rankin; and in such cases the burden is on the plaintiff to show by a preponderance of the evidence the existence of such undue influence."

It is apparent that the court did not err in refusing instruction 9, if in fact there was evidence which justified the court in submitting the issue to the jury at all, and instruction 13 was devoted mainly to the question of testamentary capacity which was taken from the jury by a peremptory instruction, and so much of it as referred to undue influence was fully covered and included in instructions 5, 6, 7 and 8 given at the request of

defendant, so that as already said the only duty devolving upon us at this time is to determine whether there was sufficient evidence to take the case to the jury.

There is nothing novel in a will contest. It is a class of litigation with which this court is very familiar. There is no conflict in opinion as to what constitutes undue influence such as will vitiate a will, or rather a paper writing propounded as such.

Again and again it has been adjudged by this court that influence in order to be undue, within the meaning of the law, which would make it sufficient to vitiate a will, must be such as amounts to over-persuasion, and coercion or force, destroying the free agency and will power of the testator. It must not be merely the influence of affection or attachment, nor the result of a desire on the part of the testator of gratifying the wishes of one beloved, respected and trusted by the testator. [Boyse v. Rossborough, 6 H. L. Cas. 6; Jackson v. Hardin, 83 Mo. 185; Carl v. Gabel, 120 Mo. 283; McFadin v. Catron, 138 Mo. l. c. 218 et seq.]

The burden of proof is on the party alleging it, but like every other question of fraud or bad faith it is a question of fact, and can rarely be proved by direct or positive evidence but may be established by facts and circumstances, and upon the ground of public policy the doctrine of courts of equity has been adopted by the courts of law in these contests, and where a devise or legacy has been given by a testator to one occupying a fiduciary relation to him, "proof of the existence of such a relation raises the presumption of undue influence, which will be fatal to the bequest unless rebutted by proof of free deliberation and spontaneity on the part of the testator, and good faith on the part of the devisee or legatee." [1 Woerner's Am. Law of Admr. (2 Ed.), sec. 32; Garvin's Admr. v. Williams, 44 Mo. 465; Carl v. Gabel, 120 Mo. l. c. 297.]

In Gay v. Gillilan, 92 Mo. 250, this last-named doctrine was extended to embrace the case of a son who by

his conduct had placed the mind of his aged father in complete subjection to his demands.

An examination of the instructions will show that the trial court applied the foregoing tests to the facts of this case and the only ground upon which its judgment can be reversed is that the facts in evidence did not justify its submission to the jury, because, as defendant insists, there was no evidence of undue influence.

Proceeding, then, to an examination of the facts in evidence, we must respond to this insistence. Mrs. Cecelia A. Rankin, the testatrix, at the time of the execution of the will in contest, was about seventy-seven years of age; she had been frail and in feeble physical health for a number of years; she had three children, two sons and a daughter; the sons were both unmarried at the time. Her permanent home for many years had been at De Soto, in this State. The will in contest was made August 17, 1899. She died in April, 1901. The evidence quite conclusively shows that in her husband's lifetime Mrs. Rankin had nothing to do with business affairs. L. J. Rankin, her husband, died in 1897, and his estate was finally settled in 1899. After the death of her husband the business affairs of the testatrix, such as the renting and collecting of rents, the payment of taxes, and the sale of property, were attended to by her two sons, Charles and Eugene; for awhile, by Charles, but for some time prior to the execution of the will, almost wholly, if not entirely so, by her son Eugene. Sometime after her husband's death in the years 1897, 1898 or 1899 (and there is a conflict as to the date) Mrs. Rankin made her will. It was drawn by Joseph G. Williams, a member of the Jefferson county bar. What the provisions of that will were was one of the disputed facts in the case. Charles Rankin testified that by that will the three children were given equal shares, but there were some special legacies to Mrs. Dausman's two oldest daughters. That will was de-

stroyed by Eugene Rankin, as he asserts, by the direction of his mother after the will in contest was made or executed. Eugene Rankin testifies that this former will was exactly like the one contested, save and except it gave Mrs. Dausman $1,500 in money or land at the option of the other heirs, instead of $1,000 in money and a lot worth $400 or $500. He testified that his mother wrote him to come to St. Louis where she was visiting at the time, in regard to changing her first will, which he said was executed in June, 1899; that when he came up she would explain the changes to him; that he went up to St. Louis from De Soto the day the will in contest was made. He was asked if he had a draft of the will with him, and he answered, ''Yes, sir, I made a copy of the old will.'' He is corroborated on this point by Bartholow who attested the will in contest, who says, that Eugene wrote him that he would be in St. Louis and wanted to see him; that prior to going out to Mrs. Rankin's boarding house, Eugene came to see him, Bartholow, and had *a rough draft* of the will his mother was to execute and at Bartholow's suggestion had Mr. Jenkins, a stenographer in the Laclede Building, copy it on a typewriter; that Jenkins was Bartholow's typewriter. It is made entirely clear from the evidence of both Eugene Rankin and Bartholow that there was no conference or explanation of any kind by Mrs. Rankin with Eugene Rankin of the changes she desired made in her will prior to the time the will in contest was prepared for her signature, but it was written by Eugene Rankin himself before he came to St. Louis and was copied by Jenkins. It is true he says the will in contest corresponded with what she told him she wanted to give Mrs. Dausman, but when she told him this he does not say, and though he claims to have had letters from his mother making a request for a change in her will and still had them, he did not produce them.

His explanation of his mother's desire for a change.

Vol 189 mo—45

in the will was that it "*was to avoid complications* with Mrs. Dausman," but by the new will Mrs. Dausman got exactly the same amount of property, $1,500, that she would have received under the June will, according to his testimony, the only difference being that under the June will she got a little house worth $400 or $500 instead of $500 in money. What complication was avoided by this slight and immaterial change is hard to imagine. If the jury believed Charles Rankin there was a much stronger motive for this change in his mother's will. By her first will she made her three children equal, but by this change Eugene got the lion's share of this valuable estate, and his sister, only $1,500 worth of property.

At this time Eugene held a power of attorney from his mother to control all of her business affairs; he was enstranged from his sister; that he exercised a strong influence over his mother is evidenced by the fact that when, in 1899, her agent had made what he thought was an advantageous sale of unproductive property, and Charles, her other son, had advised the sale, and the deed was prepared for her to execute, she declined to do so unless Eugene would consent and he refused to let her sign it, and she appealed to Mr. Blackman, to persuade Eugene to let her make the deed, and it was only after Blackman had induced Eugene to consent to it that she did sell the property.

We think the evidence tended strongly to prove that Eugene Rankin before and at the time the will in contest was written had acquired the control of his mother's business and bore a fiduciary relation to her; that he had obtained a strong control of her mind as to the disposition of her property and there was evidence that when she desired to aid the other two children she sought to keep Eugene from knowing it lest he should raise a disturbance about it. There was evidence that Mrs. Rankin had become possessed of the notion that Dausman, her son-in-law, was living off of her estate,

when in fact there was not a word of evidence that such was a fact. On the contrary, Mrs. Dausman had received from her father's estate one-fourth of the personal estate and real estate, which she sold in 1901 for $4,200 to George Mahn. When it is considered that Eugene was so embittered towards his only sister that for eight years he would not speak to her and exhibited this unnatural disposition at the time his mother died, and the close personal and financial relation which he bore to his mother and the known influence he was exerting in her affairs, and her feeble health and old age, it cannot be said that the triers of the facts could not properly have attributed Mrs. Rankin's perverted idea as to Dausman living off her estate to the suggestion of her son Eugene. Under these circumstances a will drawn by Mr. Williams was destroyed by Eugene, and the will in contest drawn by him by which he received the bulk of an estate amounting to over $18,000, and his sister, who had faithfully fulfilled all the obligations of a dutiful daughter, was cut off with $1,500. That it was a most unnatural division of her estate by Mrs. Rankin goes without saying. When we look for a reason for this unnatural preference, it cannot be found in any particular service rendered by Eugene, or any personal superority over his brother and sister. His intimate friend, Bartholow, testified that Gene had been drunk as often as sober for thirty years past, and it appears elsewhere in the record that his mother had had him treated for the liquor habit. It does, indeed, seem that Mrs. Rankin was displeased at first with her daughter's marriage, but soon forgave her, and their relations were affectionate and natural until Eugene obtained control of his mother's affairs. While in the absence of evidence of undue influence, discrimination in favor of one child over another is no evidence of undue influence, when, as in this case, that influence does appear and the favored child prepares a will by which he obtains the bulk of a parent's estate

to the detriment of his brothers and sisters, the burden is on him to show that the will was the result of deliberation and spontaneity on the part of the testator and absolute good faith on the part of the devisee or legatee, and we think the perfunctory part played by Mrs. Rankin in the execution of the will in contest and the dominating influence and the activity of Eugene Rankin in preparing the will in his mother's absence, the selection of the witnesses, and the great disproportion which he takes under such a will over his sister and brother, fell far short of that disinterested good faith and fairness which one in his position and bearing the relation which he did to his aged and feeble mother is required to show before he can profit by an instrument prepared by himself. We have read this record carefully and while we adhere to the conservative rulings of this court which scrupulously guard the right of the citizen to dispose of his property by will as he sees fit, we have never said that a will obtained by undue influence was a valid disposition of one's property, nor have we relaxed the wholesome doctrine that one occupying a fiduciary relation to a testator has the burden of rebutting the presumption that a legacy in his behalf was the result of undue influence and was the free act of the testator.

Our conclusion is that there was no error in the instructions; that the cause was fairly submitted to the jury, and that there was sufficient evidence upon which to base their verdict that the paper writing propounded as the will of Mrs. Cecelia A. Rankin was not in fact her last and testament, and that the judgment must be and is affirmed.

*Burgess, P. J.,* and *Fox, J.,* concur.