ADELINE M. LOEHR v. BRUCE STARKE, Executor, ET AL., Appellants—
56 S. W. (2d) 772.

Court en Banc, February 8, 1933.

*Lewis & Rice, Harry Troll, Forrest C. Donnell, Douglas W. Robert, Winifred McHale, Bruce Starke, R. M. Nichols, Norman Begeman* and *Leahy, Saunders & Walther* for appellants.

132

*Wurdeman, Stevens & Hoester.* and *N. Murry Edwards* for respondent.

GANTT, C. J.—An opinion in this case by WESTHUES, C., was adopted by Division Two of this court. Of its own motion, the court transferred the case to the court en banc. It was there argued, submitted and assigned for an opinion to the undersigned. On the oral argument the finding of facts in Division were challenged. On re-examination of the record said finding is sustained. We adopt that part of the opinion of our commission, which follows:

"This is a suit to set aside the last will and testament of Sidonia E. Loehr, deceased, for want of mental capacity and the exercise of undue influence. The jury returned a verdict, setting aside the will. The proponents of the will appealed from the order, overruling the motion for a new trial. There were twenty-four defendants and nine separate appeals. However, this is but one case and will be disposed of accordingly.

"In substance, the charging parts of the petition are that, at the time of the execution of the will, testatrix was of unsound mind, suffering from delusions and prejudices to such an extent that she did not comprehend who were the natural objects of her bounty, and that she was unable to do justice to the natural objects of her bounty, because of inoculations of narcotics and medicines. Plaintiff also charged that, at the time of the execution of the will, testatrix was under the influence and control of confidential advisors, namely, defendants, Dr. John C. Lebrecht and Mark M. Anderson, to such an extent that her will was subordinated to that of Lebrecht and Anderson. Defendants filed various answers to the petition of plaintiff.

"Deceased died on the third day of July, 1926, leaving as her only heir, at law, a sister, the plaintiff in this case. The will was executed on the eighth day of December, 1925. The bequests are in substance as follows: Twenty dollars ($20.00) to plaintiff in this case, Adeline M. Loehr; two hundred and fifty dollars ($250.00), jewelry and household effects to Mary Holwell. The fifth, sixth and seventh clauses of the will read as follows:

" 'Fifth: To Miss Eglantine Jordan, daughter of the late Dr. G. Alexander Jordan, I give and bequeath the sum of Five Thousand Dollars ($5000.00), as a mark of appreciation for many kindnesses bestowed upon my mother and myself by her father.

" 'Sixth: I give, devise and bequeath to my lifelong friend, Dr. John C. Lebrecht, of the City of St. Louis, State of Missouri, the sum of Five Thousand Dollars ($5000.00), for his loyal and skilful medi-

cal services at times to my mother and myself and if the said Dr. Lebrecht be not living at the time of my decease, then this legacy is to lapse.

" 'Seventh: As a slight token of recognition, I give, bequeath and devise to my esteemed business friend, Mark M. Anderson, President of the Title Guaranty Trust Company, the sum of Two Thousand Dollars ($2000.00), and to his heirs and assigns forever, for his courteous and efficient advice to me on many occasions.'

"All the residue of the property was left to Dr. Martin J. Glaser and Bruce Starke in trust for certain charities, with directions that they, the trustees, convert the property into cash within two years of the final settlement of her estate, and that the cash be paid over to the following named charities.

" 'To the Humane Society of Missouri, one-tenth (1/10).

" 'To the Convent of the Good Shepherd, one-tenth (1/10).

" 'To Father Dunne's Newsboy's Home, one-tenth (1/10).

" 'To the Blind Girls Home, one-tenth (1/10).

" 'To the Salvation Army, one-tenth (1/10).

" 'To the Oblate Sisters of Providence (Colored), one-twentieth (1/20).

" 'To the Little Sisters of the Poor (South Side Home), one-twentieth (1/20).

" 'To the Little Sisters of the Poor (North Side Home), one-twentieth (1/20).

" 'To St. Vincent DePaul Society, one-twentieth (1/20).

" 'To St. Anthony's Hospital, one-twentieth (1/20).

" 'To the Bethesda Charities, one-twentieth (1/20).

" 'To St. Joseph Deaf Mute Institute (901 North Garrison Avenue), one-twentieth (1/20).

" 'To the Memorial Home (2609 South Grand Avenue), one-twentieth (1/20).

" 'To the Home of the Friendless (4431 South Broadway), one-twentieth (1/20).'

"The evidence discloses the following: Adlbert Loehr was, at one time, the editor of the Westliche Post, a German newspaper, published in the city of St. Louis. He was married and to this union three children were born. They were Adeline, the eldest of the daughters and the plaintiff in this case, Sidonia, the testatrix, and a son. who died in infancy. Adlbert Loehr died, when plaintiff and testatrix were very young, thus leaving the widow, without any property, to support and educate these children. Adeline was furnished a good education, by the hard work and economy of her mother. After Adeline had finished at the normal school, she began teaching. Sidonia, the testatrix, did not receive an education, as did Adeline, but, while still in her teens, went to work at odd jobs. The mother and her two daughters lived together, until a few years after

Adeline had been teaching in the schools of St. Louis, when differences arose and, according to the record, there seems to have been a bitter disagreement. It matters not, for the purpose of this case, who was at fault in these matters, but only that these disagreements finally resulted in the separation of the family. In the year 1884, Adeline left her former home and lived alone. Testatrix supported and remained with her mother, until the mother's death in 1909. After leaving her home in 1884, Adeline never became reconciled with her mother and sister and never associated with them again. Adeline taught in St. Louis for a number of years and then went to the State of California. Her whereabouts, from that time up to the date of the trial, were minutely detailed in the evidence. Adeline was finally taken to a sanitarium in the State of California. In the year 1912, after Adeline had been in the sanitarium a few months, Sidonia sent Dr. Lebrecht to the State of California, for the purpose of bringing Adeline back to the city of St. Louis. Adeline returned to St. Louis, but she and her sister did not associate, nor did they ever become reconciled.

"The testatrix, during all these years, was employed at various positions and finally went to work for a real estate firm and held that position until she went into the real estate business for herself. Testatrix was rather successful. She bought and sold mortgages, negotiated real estate deals and carried on a general real estate business. She accumulated an estate of approximately thirty-eight thousand dollars ($38.000).

"On the part of the contestants, the evidence to support the charge of insanity, is substantially as follows: According to the testimony of the chief of police of Richmond Heights of St. Louis, where testatrix lived the last years of her life, testatrix frequently called on him for trifling matters, such as boys playing ball in the alley in the rear of her place. At one time she called him and had him search the house for a burglar. A window of the third floor was found open and testatrix declared it must have been opened from an adjoining house about fifteen feet away. This witness further testified testatrix objected to people driving through the alley and to the dumping of ashes therein, and this became the object of frequent arguments. She also had frequent trouble with her maids. Testatrix owned an apartment house, consisting of three apartments. When the tenants moved she always called on the witness to watch them and see that they did not damage the steps or other parts of her property, or take anything belonging to the house, as she often complained they did. At one time she complained of a tenant carrying booze into one of the apartments. She desired to place a fence around her property to protect the lawn, but as that was against the building restrictions of Richmond Heights, it was finally the cause of a lawsuit. Oftentimes, when the marshal called, she informed

him she was too busy, or did not feel well and stated that after she had seen her doctor she would feel better and talk to him. After relating facts, as substantially set out above, the witness stated that in his opinion testatrix was of unsound mind.

"According to the opinions of a number of tenants of the testatrix, she was of unsound mind. They based their opinions on facts substantially as follows: Testatrix had agreed to furnish hot water for the tenants, but she refused to do so, except on Saturdays. She would not permit the janitor to fire the furnace enough to keep the apartments sufficiently warm. Testatrix refused to permit her tenants to hang their laundry in the basement, stating that it would interfere with the fire department in case of fire, and also that it caused dampness in the house. At times, when the tenants were absent, she would go through their apartment, giving as a reason, it was her building and she had a right to go through it. She would turn out the lights in the hallway, stating they, the tenants, did not need any light. Testatrix was a very sickly looking woman and dressed very oddly. She always wore long sleeves, long dresses, high shoes and generally a large green hat. At one time, when a tenant moved into her apartment, she compelled the tenant to take the piano into the house through the window, because she did not want her front steps broken, by moving the piano through the door. At one time, a tenant saw testatrix looking through a key hole to see what company her tenants were entertaining. The deceased often spoke of a certain lot being her property, when in fact she did not own this lot.

"Witness Blake, who operated a filling station near deceased's home, testified and based his opinion that deceased was of unsound mind on the following facts: Deceased was a regular customer of the witness and when she purchased oil and gas would always watch closely that she received the amount for which she had paid. She refused to let the witness use a metal container to put oil in her car, but insisted that he, the witness, use glass bottles in order that she might observe the amount of oil, she had purchased, being put into the car. At one time she called the witness, about eleven o'clock at night, and asked him to come to her apartment, stating that someone was trying to get into her basement. Upon investigation, they found a support of the water pipe had given way and the vibration of this water pipe caused a sound similar to someone using a hammer. On several occasions she spoke of building a hotel or apartment house on the lot adjoining her building, when in fact she did not own this lot. There were a number of disputes regarding the alley-way between her property and the property belonging to the oil company, but this matter was finally settled and the testatrix agreed that she owned half of this alley and the oil company the other half.

"A paper hanger, by the name of Rosenfeld, testified that on a number of occasions he worked for the testatrix and that he had

papered rooms for her as late as March, 1926; that the deceased insisted on buying her own paper, claiming she could buy it cheaper than the witness; that at one time she bought paper and instructed him to hang it a certain way and that he, the witness, insisted she was having him put the paper on the wall upside down; but deceased insisted on having it that way, and after the job was completed she was sorry and wanted to have it changed, but it was then too late.

"Several of the colored janitors, who had worked for testatrix, testified that testatrix would accompany them to the basement and show them just how to build the fire and how much coal to put into the furnace, and if they would put in more, she would compel them to take it out and rebuild the fire. One of the janitors testified she compelled him to use the water, wasted from the melting of the ice in the ice-box, to scrub the steps, stating that that water was good enough and she would have to pay for the water taken from the hydrant. When asked about testatrix's sanity, another janitor testified that she was a 'sometimes' person; 'sometimes she was all right, sometimes she wasn't.' One of the janitors testified that in March, 1926, testatrix called him and asked if he had seen her sister, Adeline, leaving the house. The janitor had not seen the sister, nor did he think anyone had been there, and so informed deceased. Deceased replied, 'Well, I don't feel so well, I believe I will go up and call the doctor.'

"Another witness testified she had exchanged Christmas gifts with testatrix for a number of years, but that one year, prior to Christmas, testatrix informed her not to send her any presents for Christmas; that she did not, and subsequently testatrix was angry because she did not receive a present.

"This is substantially the testimony offered in the record to prove that testatrix was of unsound mind. We have related the most damaging testimony we can find in the record. Interspersed with the testimony of these same witnesses, we find the witnesses transacted business with testatrix, and there is not a scintilla of testimony in the entire record that the deceased was not, at all times, fully capable of taking care of her own interests, looking after her own affairs, and that deceased did not understand fully every business transaction she undertook. With reference to the lot testatrix claimed she owned, the record discloses the following: A witness, by the name of Schellenberg, testified that he desired to purchase the property next to the apartment of the deceased, but the title was in a rather complicated condition; that four individuals owned the ground, and there was a judgment against it for eighteen hundred dollars ($1800); that he put the money up in escrow for the purchase of the lot. He further testified that, while he was negotiating for this property, the deceased called and informed him that she thought she could obtain

that property for him, and did so; that the deceased purchased the property in her own name, obtained the title, and then gave the witness a quitclaim deed, transferring the title to the witness; that she handled this deal in a very satisfactory manner. This is the lot that the witnesses referred to that deceased claimed she owned. On cross-examination, witness, Schellenberg, testified that, after he purchased this lot, testatrix called him a number of times with reference to the lot. Not that she claimed to be the owner, but that the lot was being used to the detriment of her property. The record teems with testimony, showing testatrix to have been a keen, shrewd, business woman. She successfully conducted her real estate business to within a few weeks of her death. She made out income tax reports and gave advice to her clients, and in no instance, so far as this record is concerned, did anyone ever question testatrix's ability to intelligently conduct her business.

"There is no evidence in the record to support the charge in the petition that testatrix was addicted to the use of narcotic drugs. The testimony of every physician, who waited on her during her illness, is to the contrary. Testatrix died of carcinoma. She had suffered with this ailment for many years, undergoing a number of operations in an effort to arrest the dreadful malignant disease, but without success. This illness caused much pain and at times an anaemic condition, for which she required frequent treatments. The physicians, who waited on her, testified that her ailments in no way affected her mentally.

"Appellants urged that the trial court erred in submitting to the jury the question of testatrix's mental incapacity to make a will. We agree to this contention. The most that can be said of the evidence is that it reveals testatrix to have been extremely saving; perhaps even to a point of being miserly. The testimony, upon which the witnesses based their opinions, that testatrix was of unsound mind, revealed what we might denominate peculiarities and nothing more. Considering, therefore, all the evidence in the case, and giving contestant the benefit of every reasonable inference that may be legitimately drawn therefrom, there is no substantial evidence in the record to support the charge of mental incapacity on the part of the testatrix, at the time of the making of the will. This question, on a somewhat similar state of facts, was fully discussed and reviewed in an elaborate opinion, by Division One of this court, in the case of Berkemeier v. Reller, 317 Mo. 614, 296 S. W. 739. At page 644 of the opinion we find the following statement of law applicable to this case:

" 'It has been stated by this court many times that imperfect memory resulting from sickness or old age, forgetfulness of names of persons, the repetition of questions, and eccentricities in dress and oddities of habit are not evidence of such mental disease as renders

a person incapable of making a will, when these things are not accomplished by proof of facts and of acts showing that the person is incapable of understanding the ordinary affairs of life, of transacting his ordinary business, understanding the extent of his property, and appreciating those who would be the natural objects of his bounty. [Southworth v. Southworth, 173 Mo. 59, 73 S. W. 129; Winn v. Grier, 217 Mo. 420, 117 S. W. 48; Gibony v. Foster, 230 Mo. 106, 130 S. W. 314; Sayre v. Trustees Princeton University, 192 Mo. 95, 90 S. W. 787; Bensberg v. Washington University, 251 Mo. 641, 158 S. W. 330.]' ''

■ ''See Smarr v. Smarr, 319 Mo. 1153, 6 S. W. (2d) l. c. 864 (9). The opinions of lay witnesses, as to the insanity of an individual, are of no value, when not based on facts inconsistent with sanity. [Berkemeier v. Reller, 37 S. W. (2d) l. c. 431 (1), and cases there cited; Smarr v. Smarr, supra, l. c. 864, 5 (10); 22 C. J. 608.]

''The second question is that of undue influence. We do not feel that the evidence on this point justifies a lengthy discussion. All the evidence, offered by contestants to establish the charge of undue influence, proves one fact only, that is that Dr. John C. Lebrecht, who received a bequest of five thousand dollars ($5000), was one of three doctors that rendered medical aid to the testatrix. Dr. Martin J. Glaser seems to have been the principal medical advisor of testatrix, during the latter years of her life. Dr. Lebrecht was not a surgeon, but, according to the evidence, had been the family physician and the medical advisor of testatrix and her mother for many years. After the mother's death, Dr. Lebrecht continued to be one of the testatrix's medical advisors up to the time of her death. Testatrix also had a few business deals with this doctor and at times borrowed small amounts of money from him, which were repaid. There is no evidence whatever that Dr. Lebrecht ever discussed the making of a will with testatrix, or that she sought his advice in this matter. Deceased had executed a will two years prior to the date of the will here in question. The latter will is similar to the first in so far as the various bequests are concerned. In the first will Mark Anderson, charged with undue influence, was named as executor. Mark Anderson did not know a second will had been executed until after the death of testatrix. The will here in question was prepared by Bruce Starke, an attorney, who was not acquainted with Dr. Lebrecht until after the death of testatrix. Bruce Starke had handled a personal injury claim for deceased sometime prior to the making of the will. At the time of the execution of the will, according to Starke's testimony, testatrix came to his office and desired a few changes to be made in her will. Among the changes was the fifth clause. Starke's testimony with reference to this is as follows:

'' 'Q. How does that Fifth Clause read? A. (Reads): To my faithful friend, Dr. G. Alexander Jordan, Hospital Commissioner

of the City of St. Louis, I give, bequeath and devise the sum of Five Thousand Dollars, and to his heirs and assigns forever, as a mark of appreciation for kindness bestowed upon my mother and myself.

" 'Q. What discussion did you have with reference to that clause? A. She told me that either Doctor Jordan was dead or that he was about to die, and that she wanted that clause of the will changed so that the bequest would go to Miss Eglantine Jordan, daughter of Doctor Jordan; that she knew Miss Eglantine Jordan, and that she had been crippled in an accident of some kind, and that she wanted her to be sure to have that bequest.'

"The testimony of this witness further reveals that testatrix had three interviews with Starke with reference to the will. On testatrix's part, it discloses a keen insight and understanding of business affairs. A provision in the will, authorizing her property to be sold, on petition in the circuit court, was changed to one granting authority to the trustees to sell the property in order to avoid the expense of attorney's fees and costs of a proceeding in the circuit court. Bruce Starke was named executor in order that the estate might have the benefit of his legal services. However, he was to receive only the executor's fees. Thus the economy, practiced by the testatrix during her life, was carried, at her direction, to the management of her estate.

"It will also be noticed that testatrix gave five thousand dollars ($5000) to the daughter of Dr. Jordan, for the same reason that the sum of five thousand dollars ($5000) was given to Dr. Lebrecht. Mark Anderson, who is charged in the petition with having unduly influenced testatrix, was not advised of the making of the second will. Anderson is the beneficiary of a two thousand dollar ($2000) legacy, as a token of appreciation for advice given through a long number of years. There is nothing in the will itself that reflects either mental incapacity or undue influence. On the contrary, it is entirely consistent with, and supports the idea that the will was the result of the wishes and desires of testatrix, uninfluenced by anyone, and made with a full understanding of her rights to dispose of her property. There were a few bequests of substantial amounts given to lifelong friends, who had aided testatrix and her mother in time of need. The bulk of the estate was left to charities of her own selection. The small amount given to testatrix's only sister and heir was explained in a letter in testatrix's own handwriting, and offered in evidence. This explanation is consistent with the testimony of the sister, the contestant. It reveals many years of estrangement between them, which continued to the time of testatrix's death."

In effect the opinion then ruled the question on the theory that the presumption of undue influence disappeared on the appearance of rebutting testimony, and for that reason there was no evidence of undue influence, citing Bushman v. Barlow, 316 Mo. 916,

l. c. 947, 292 S. W. 1039; Mundy v. Knox, 321 Mo. 168, 9 S. W. (2d) 960, l. c. 965-6, and Denny v. Hicks (Mo. App.), 2 S. W. (2d) 139, l. c. 144. Those cases so hold. We think said ruling unsound. The presumption under consideration is not a mere legal fiction or procedural rule. It rests on a substantial basis of fact or inference. The presumption and fact, or inference, go hand in hand and really are the same thing. Hence, the presumption, with its underlying facts or inferences, once being in the case, never does or can disappear but raises an issue for the jury. [Bridwell v. Swank, 84 Mo. 455, l. c. 469, 470; Mowry v. Norman, 204 Mo. 173, l. c. 191, 103 S. W. 15; Canty v. Halpin, 294 Mo. 96, l. c. 103, 242 S. W. 94; Shapter v. Boyd, 327 Mo. 397, l. c. 413, 37 S. W. (2d) 542.] The cases of Bushman v. Barlow, Munday v. Knox, Denny v. Hicks, supra, and other cases holding that a presumption of undue influence disappears on the appearance of rebutting testimony are to that extent overruled.

■ But did the evidence in the instant case afford a sufficient basis on which to rest a presumption of undue influence? The charge of undue influence against Mark Anderson was abandoned. And there was no fact or circumstance in evidence tending to show that Dr. Lebrecht by word or act unduly influenced testatrix to execute either will. Indeed, there was no evidence tending to show that he exerted influence of any kind in that behalf. Even so, contestants contend that the mere relation of physician and patient raised a presumption of undue influence. We do not think so. The first ruling of this court on the question was in Garvin's Admr. v. Williams, 44 Mo. 465. It was a suit to set aside the will of W. D. Peticrew, who resided with his guardian from childhood. In early life and before of age he was afflicted with tuberculosis. It was apparent that he could not long survive. Two days after he became of age his guardian made final settlement with the court. The guardian then paid him by giving his note for the amount due. Thereupon he entered of record a release of the guardian and his securities. On the next day and at the home of the guardian he executed his will, disinheriting his relatives and giving all of his large estate to the guardian and his family. In three months he died. Contestants tendered an instruction reciting the facts and directing the jury that the alleged will was presumptively procured by undue influence. The court refused the instruction on which error was assigned. In ruling the question we said:

"Under the circumstances in which the will was made it was presumptively invalid, and the burden of proving its validity rested upon those who sought to derive an advantage under it. The instruction, therefore, hereinbefore alluded to, which was refused by the court, should have been given."

This was not a ruling that the mere relationship raised a presumption of undue influence. It was the relationship coupled with other

facts and circumstances in evidence that raised said presumption.

The Garvin's case was cited in Harvey v. Sullens, 46 Mo. 147. In that case the principal devisee Sullens was a stranger in blood to the testatrix. He was a near neighbor, member of the same church and on the friendliest of terms with her. The will was written by him during her last illness, and the evidence tended to show that he actually procured the execution of the will. There was no ruling in that case that the mere relationship raised a presumption of undue influence.

The Garvin's case was also cited in Bridwell v. Swank, 84 Mo. 455. In that case the testatrix resided with her guardian, whose wife was the aunt of testatrix and the principal beneficiary under the will. The guardian had not made final settlement with her at the time the will was executed. Contestants were half-sisters of testatrix. Proponents specifically denied certain allegations of the petition, admitted the death of testatrix; that she was nineteen years of age and unmarried; that Swank was her guardian, and that he had not made final settlement of his guardianship. It then specifically denied the charge of undue influence.

The allegation in the petition that testatrix resided with the guardian was not denied and was taken as admitted by the pleadings. At the trial proponents introduced evidence to show execution of the will and that the testatrix was of sound mind. They then introduced in evidence the will, which gave to her aunt, Mrs. Swank, all of her property "as a slight testimonial for the kindness of my aunt in her untiring care and attention to me during my sickness during the past six months." Proponents then rested. Thereupon contestants declined to offer proof and relied upon the admissions in the answer, the admission that testatrix resided with the guardian and the declaration of testatrix in her will as to the motive of the gift to her aunt. Proponents then "proceeded to introduce witnesses for the purpose of controverting any evidence of undue influence and of repelling the legal presumption of undue influence flowing from the fiduciary relation admitted by the answer." The jury sustained the will and judgment was so entered. On appeal, contestants assigned error on an instruction given at the request of proponents. In the course of the opinion we said:

"To decide upon the character of this instruction it is only necessary to recall certain propositions of law which have been settled after thorough and repeated examinations. A devise by a ward to or for the benefit of his guardian, in any proceeding to establish or contest the same, is presumed in law to have been procured by the undue influence of the guardian, and the burden of repelling this presumption and thereby establishing or maintaining the devise rests upon those seeking to derive advantage from it. [Garvin's Admr. v. Williams, 44 Mo. 465; Garvin's Admr. v. Williams, 50 Mo. 206.]

If the fiduciary relation of guardian and ward existed at the time of the execution of the gift or devise, and the parties were so situated with reference to each other that undue influence could have been used, the law presumes that it was used, and those seeking to derive advantage from it must rebut the presumption by competent and convincing proof. This presumption rests upon three facts for its formation: First, the fiduciary relation; second, the gift or devise to, or in the interest of the guardian; third, an opportunity for an exercise of undue influence.''

It will be noted that the opinion in the Bridwell case states that proponents introduced testimony to controvert evidence of undue influence and to controvert the presumption of such influence. In other words, we found facts and circumstances in evidence which, coupled with the confidential relation, raised a presumption of such influence.

The Garvin, Harvey and Bridwell cases are the basis for the contention that a mere confidential relation raises a presumption of undue influence. As stated, there were facts and circumstances in evidence in those cases from which it could be inferred that the beneficiary had been active in some way which caused or assisted in causing the execution of the will. It was those facts and circumstances which, coupled with the relationship, raised the presumption of undue influence. And on examination of the will cases in this State we find, with few exceptions, facts and circumstances in evidence coupled with the relationship which raised such presumption. In the case of Re Llewellyn's Estate, 66 A. L. R. 222, 1. c. 231, many of the Missouri cases are listed. ■ Furthermore, we have held that the mere opportunity of a beneficiary to exert undue influence unsupported by other evidence showing its actual existence, does not raise a presumption of undue influence. [Kleinlein v. Krauss, 209 S. W. 933, 1. c. 936; Kuehn v. Ritter, 233 S. W. 5, 1. c. 7; Tekenbrock v. McLaughlin, 209 Mo. 533, 1. c. 551, 108 S. W. 46; Van Raalte v. Graff, 299 Mo. 513, 1. c. 527, 528, 253 S. W. 220; McFadin v. Catron, 138 Mo. 197, 38 S. W. 932, 39 S. W. 771.]

Contestant cites cases as follows: Mowry v. Norman, 204 Mo. 173, 1. c. 191, 103 S. W. 15; Heflin v. Fullington, 37 S. W. (2d) 931, 1. c. 934; Canty v. Halpin, 294 Mo. 96, 242 S. W. 94, 1. c. 96; Wendling v. Bowden, 252 Mo. 647, 1. c. 687, 161 S. W. 774; Rayl v. Golfinopulos, 233 S. W. 1069, 1. c. 1072; Clark v. Crandall, 319 Mo. 87, 5 S. W. (2d) 383, 1. c. 385; Moll v. Pollack, 319 Mo. 744, 8 S. W. (2d) 38, 1. c. 45; Burton v. Holman, 288 Mo. 70, 231 S. W. 630, 1. c. 633; Sittig v. Kersting, 284 Mo. 143, 223 S. W. 742, 1. c. 749; Roberts v. Bartlett, 190 Mo. 680, 1. c. 701, 89 S. W. 858; Dausman v. Rankin, 189 Mo. 677, 1. c. 703, 88 S. W. 696; Carl v. Gabel, 120 Mo. 283, 1. c. 297, 25 S. W. 214; Grundmann v. Wilde, 255 Mo. 109, 1. c. 116, 164 S. W. 200; Byrne v. Byrne, 250 Mo. 632, 1. c. 646, 157 S. W. 609.

In the Mowry case we said: ''. . . in cases where a 'patient makes a will in favor of his physician, a client in favor of his lawyer,

a ward in favor of his guardian, or any person in favor of his priest or religious adviser, or where other close confidential relations exist, the law indulges the presumption that undue influence has been used, and such wills, when made to the exclusion of the natural objects of the testator's bounty, are viewed with great suspicion by the law, and some proof should be required besides the *factum* of the will before the will can be sustained.' '' In that case facts and circumstances were in evidence which, coupled with the relationship, raised a presumption of undue influence. In the other above cited cases, except Carl v. Gable, there were also facts and circumstances in evidence coupled with the relationship which raised such presumption. In the Carl case we held there was no evidence tending to show a confidential or fiduciary relation. Thus it appears that it is not the rule in this State that a mere confidential relation raises a presumption of undue influence. The weight of authority is against such rule. [Re Llewellyn's Estate, 66 A. L. R. 222, note 228; 1 Woerner Law of Administration, p. 63; 1 Underhill on Wills, p. 208; Gardner on Wills, p. 180.] The case of Mowry v. Norman, 204 Mo. 173, 103 S. W. 15, and other cases containing statements indicating that a mere confidential relation raises a presumption of undue influence are to that extent overruled.

It follows that the judgment of the circuit court should be reversed and the cause remanded with directions to the trial court to permit proponents to establish the will in solemn form and that the paper writing be admitted to probate in the Probate Court of St. Louis County as the last will and testament of Sidonia E. Loehr, deceased. It is so ordered. All concur.