NELLIE E. CLARK v. COMMERCE TRUST COMPANY, a Corporation, MERCY HOSPITAL of Kansas City, KANSAS CITY COUNCIL, BOY SCOUTS OF AMERICA, CHARLES FILLMORE, LOWELL FILLMORE, LOWELL FILLMORE, Trustee, and UNITY SCHOOL OF CHRISTIANITY, Appellants.—62 S. W. (2d) 874.

Court en Banc, July 20, 1933.

244

*Atwood, Wickersham, Hill & Chilcott* for Commerce Trust Company; *Otto Basye* for Charles Fillmore, Lowell Fillmore, Lowell Fillmore, Trustee, and Unity School of Christianity; *R. R. Brewster* for Children's Mercy Hospital; *McCune, Caldwell & Downing* for Kansas City Council of Boy Scouts of America.

*Gossett, Ellis, Dietrich & Tyler* for respondents.

248

WESTHUES, C.—Respondents filed this suit to contest the will of Laura R. MacMahon, deceased, upon the ground that she lacked testamentary capacity and that the will was the result of undue influence. Upon a trial before a jury the will was set aside. Nine jurors signed the verdict. Being unsuccessful in their motion for a new trial proponents appealed.

Laura R. MacMahon. a single person, died December 11, 1926, in Kansas City, Missouri, leaving the following, next of kin, who would have inherited her property had she died interstate; plaintiff, Nellie E. Clark, a grandniece; Wilbert L. Hunt; Fred W., Benjamin H. and James D. MacMahon, grandnephews and Richard R. Mac-Mahon, a nephew; all of whom were named as defendants. These defendants lived in Ohio, Indiana and Wyoming. Plaintiff lived in Indiana. The will in question. omitting caption and the first clause, which directed the payments of debts and funeral expenses, reads as follows:

" 'Second: Subject to the provisions and conditions. hereinafter made, I give and bequeath to Wilbert L. Hunt, Nellie Hunt and Fred W. MacMahon each, grandchildren of my brother William W. MacMahon. deceased, the sum of One Hundred Dollars ($100.00).

" 'I give and bequeath to my nephew, Richard R. MacMahon, the sum of One Hundred Dollars ($100.00).

" 'I give and bequeath to Benjamin H. MacMahon and James D. MacMahon, sons of my nephew Richard R. MacMahon, each the sum of Five Hundred Dollars ($500.00).

" 'The above bequests to Richard R. MacMahon, Wilbert L. Hunt, Nellie Hunt and Fred W. MacMahon are made for the aforesaid amounts because each of them has received and will receive from the estate of Sarah J. Huntington, deceased, substantial inheritances and on account thereof and for other reasons I feel that they have no further claim upon my bounty.

" 'I make the aforesaid bequest to Benjamin H. MacMahon and James D. MacMahon in the amounts aforesaid because their parents are well-to-do and I feel they have no further claim upon my bounty.

" 'I give and bequeath to my friend, Lois L. Coldren of Kansas City, Missouri, the sum of Five Thousand Dollars ($5,000.00).

" 'I give and bequeath to the Mercy Hospital of Kansas City, Missouri, the sum of Five Thousand Dollars ($5,000.00).

" 'I give and bequeath to Kansas City Council, Boy Scouts of America, the sum of Five Thousand Dollars ($5,000.00).

" 'I make the above bequests to Mercy Hospital and the Kansas City Council, Boy Scouts of America, in order to aid them in the splendid work they are doing for the children of Kansas City and vicinity.

" 'But, provided and upon this condition, viz; that if any one or more of the legatees named in this second paragraph of this my will be not living at the time of my death, then such legacy or legacies shall, in the case of those not then living, lapse, and the specific bequest or bequests to them here made shall in such cases be void and shall not be paid but shall become a part of the residue of my estate.

" 'Third: I give and bequeath to Charles Fillmore my Brunswick Super Heterodyne Radiola.

" 'Fourth: All the rest, residue and remainder of my property, real, personal and mixed, wheresoever the same may be situated that I may die possessed of, or that I may be entitled to, I give, devise and bequeath to Unity School of Christianity, a corporation, of Kansas City, Missouri, to aid in carrying on its work, and if any part of my residuary estate shall consist of any kind or kinds of property that cannot lawfully be vested directly in said corporation, then I give, devise and bequeath all such property to Lowell Fillmore as trustee with full power, authority and direction to sell all such property and convert the same into cash, and, in lieu of such property to pay the cash to said Unity School of Christianity, a corporation. And if said Lowell Fillmore shall not for any reason accept such appointment as trustee, or shall fail to complete the trust herein granted, then I direct that the executor of my estate shall act as such trustee with all of said powers.

" 'In order that all interested persons may clearly understand, why I make the above bequest to the Unity School of Christianity, I desire to make it known that I am convinced that the Unity School of Christianity has done a tremendous amount of good and will

continue to do so. I feel that in making this bequest I am helping the Unity School of Christianity to give to others the same happiness, peace and solace I have received, and it will enable the school in some degree to widen the field of its usefulness. My relatives have not shown toward me the love and affection that I think is my due. The Officers and those connected with the Unity School of Christianity have always been kind and considerate of me. As stated above my relatives have received and will receive from the estate of my sister Sarah substantial inheritances and are and will be well-to-do. I, therefore, deem it natural and proper for me to make this bequest, and I prefer to state my own reasons therefor rather than leave the reasons to be stated by others after my death.

" 'Fifth: I direct and specifically provide that if any beneficiary named in this will, or any one for them or for any of them, shall at any time in any manner contest or seek to set aside this my will, such beneficiary or beneficiaries shall receive nothing from my estate.

" 'Sixth: I appoint the Commerce Trust Company, a corporation of Kansas City, Missouri, as executor of my estate.

" 'In Witness Whereof, I have hereunto set my hand and seal this 27th day of January, 1926, at Kansas City, Missouri.

" 'LAURA R. MACMAHON.' "

Five persons signed as witnesses to the will.

Lois L. Coldren; Mercy Hospital of Kansas City, Missouri; Kansas City, Boy Scouts of America; Unity School of Christianity; Charles Fillmore; Lowell Fillmore and Lowell Fillmore, trustee, were made defendants as well as the relatives of respondent above mentioned.

The petition charged that the testatrix was of unsound mind due to advance age and to suffering from a toxic goiter and dropsy, which rendered her so mentally infirm and physically incapacitated that she was incapable of making a will. The petition also charged that Charles Fillmore, Lowell Fillmore, Royal Fillmore and others connected with the defendant, Unity School of Christianity, did cajole, flatter, coerce, over-persuade and play upon the physical and mental infirmities of testatrix and did assert such an undue influence upon her in and about the making of a paper writing, purported to be her last will and testament, that the paper writing was not in fact the last will of Laura R. MacMahon. The petition also charged that persons named as connected with Unity School of Christianity, "did absolutely dominate said Laura R. MacMahon and did handle her affairs and did take and handle her money, the plaintiff being unable at this time, to state and describe in any more detail the exact nature of the acts of such divers persons as aforesaid so representing and acting in behalf of the Unity School of Christianity."

Defendants, Richard R. MacMahon and Wilbert L. Hunt filed an answer joining plaintiff in her petition to set aside the will. The appellants, Commerce Trust Company, Mercy Hospital and Kansas

City Council, Boy Scouts of America, each filed a separate answer. Unity School of Christianity, Charles Fillmore, Lowell Fillmore and Lowell Fillmore, trustee, also appellants, jointly filed an answer to the petition. Lois L. Coldren filed a separate answer but did not appeal.

The issues tried were the mental capacity of the testatrix to make a will and the exercise of undue influence. Appellants contend that there was no substantial evidence in support of the charge of mental incapacity or undue influence and, therefore, the trial court erred in submitting those issues to the jury. In order to dispose of these questions it will be necessary to make a rather complete statement of the case. The officers of the Unity School of Christianity were charged with exercising undue influence. A short history of Unity will lead to a better understanding of the events that follow. We quote the following from appellants' brief, omitting parts deemed argumentative.

"The school was organized in 1889, Myrtle Fillmore, the wife of Charles Fillmore, being the originator. At that time the Fillmores had but very little property; they were poor people. The basic tenet, as we understand it, is right thinking and right living in accordance with the teachings of Jesus Christ. Unity does not profess any particular creed, but takes from all religions that which is deemed best. As a corollary of the major premise that right thinking is one of the fundamentals of life, arises the belief and teaching that right thinking, belief in God and prayer may alleviate and cure diseases, and, consequently, it maintains a healing department known as Silent Unity. There is also a publishing department which issues many magazines and publications which are distributed all over the world. The institution has grown greatly until at the time of the trial there were employed in Kansas City, over 565 persons, and the physical properties were valued at over $3,000,000. The Unity School of Christianity is a separate, independent corporation from the Church, or religious society. The school is educational and the Church religious.

"In 1914 the School was incorporated all of the stock being owned by Mr. and Mrs. Fillmore and their three sons, Lowell, Rickert and Royal, the latter of whom died after service in the late war. In August, 1919, all of the Fillmores owning all the stock of the Unity School of Christianity executed a declaration of trust whereby they 'dedicated all their right, title and interest in said corporation in trust' for the benefit of the adherents and at that time the physical properties were worth over $1,500.000. In April, 1921, the Fillmores caused the articles of association to be amended, which amendment provided 'that no dividends shall ever be declared or paid, but all profits and property of this organization shall be used to carry out the purposes of the organization or some part thereof.' On June

22, 1923, the Fillmores again executed and filed a declaration of trust whereby they 'for themselves, their heirs and assigns disclaim any right of private property in and to the shares of stock of said corporation,' etc. They by these acts voluntarily waived all right of private property in the stock and provided that no dividends should ever be declared, and they gave up for the benefit of the organization physical properties worth $3,000,000. . . .

"At the time of the trial Charles Fillmore, the president of the School, was receiving a salary of $7,500; owned no real estate, and had no personal property except a little furniture, a Ford automobile, and a few hundred dollars in the bank; he did not practice tithing, but he gave back more than a tenth to the School, so that by the end of the year he would have nothing left. His wife, Myrtle Fillmore, received as a teacher $6,000 a year, and gave most of it to the work of the School, and owned nothing except wearing apparel."

The Fillmores reserved for themselves, as trustees, and to their successors in trust, the right to manage and control the business and to fix their own compensation for their labors. They also reserved the right to appoint their successors in trust. A more detailed statement of the amendments of the articles of incorporation, with reference to this matter, will be found in Klaber v. Unity School of Christianity, 330 Mo. 854, 51 S. W. (2d) l. c. 31, 32.

The testatrix was about seventy-one years of age at the date the alleged will was prepared and signed. She was born and reared in Ohio. For many years, after the death of her father, she lived with her widowed sister, Mrs. Sarah J. Huntington. About the year 1911, testatrix moved to Kansas City and became an adherent of the Unity School of Christianity. She either lived in property belonging to Unity or within a short distance of Unity center. She had been afflicted for many years with a large goiter and for this ailment she received many treatments from Mr. Charles Fillmore, the acknowledged leader of Unity. The treatment administered to testatrix for the cure of her goiter consisted of the teaching of right thinking and of prayer, of which the following are samples as disclosed by the cross-examination of Mr. Charles Fillmore:

"Q. (by Dietrich, reading) 'The central thought cause of goiter is greed. The greed may not be for money; it may be a desire for knowledge or for some other good, a desire that has become such an all-absorbing interest in the individual's consciousness that he has become very selfish and stingy about it. Such a one needs to begin to give freely on some plane of consciousness, and lovingly to express his talents for the benefit of others. This, of course, must be done in wisdom.

" 'To remove an appearance of goiter, hold'—you mean, take this prayer or thought and hold it in your conscience? Is that it? A. Yes.

"Q. You subscribed that they do that daily? A. Yes, sir.

"MR. DIETRICH (reading): 'The all-powerful Christ mind in me relieves all congestion, and dissolves and dissipates every greedy, false thought, belief, desire and appearance (growth) from my body. I set free the power in my throat, and it is equalized throughout my organism. My body is God's pure, holy temple. All of its forces are now equalized in Spirit and are working together in perfect order and harmony. Freedom of expression is now established in my life; unselfish love and wisdom guide me in all my ways.' That is part of what you taught and one of the prayers you used, wasn't it? A. Yes; but to understand this, I would have to go into the metaphysical meaning of the different activities of the mind in man.

"Q. (by Mr. Dietrich) It was not only the matter of greed for money, but it might be greed about other things? A. Yes, sir."

"From the book issued by Unity entitled 'Heal Thyself,'—Lesson 23 on Goiter.

" 'Goiter. Goiter is a swelling, an enlargement of the thyroid gland. Its mental basis is said to be a belief or a thought on which the individual has dwelt so much that it has become unduly important, has made a false growth. Such a thought is not necessarily an error thought; the error lies in the individual's giving it undue attention, which throws other thoughts out of balance. Unbalanced thoughts cause abnormal conditions in the blood. The function of the thyroid gland is to cleanse the blood. When thoughts poison the blood the thyroid gland is overtaxed in trying to do its cleansing work. It swells; the appearance is known as goiter.

" 'When the mind that has caused such inharmony is freed from congesting thoughts the blood assumes its normal condition, the work of the thyroid gland is lessened, and the swelling disappears.

" 'To prevent goiter, to heal goiter, to keep level-headed and thereby to increase good health, meditate on the following prayer and make its theme a part of your daily living.' That is a correct recital of what you teach, isn't it? A. In general, it corresponds with the Divine Remedy statement that you read.

"Q. I thought so. And that is the talk, a metaphysical talk that you had with Miss MacMahon, that you talked over with her many times in endeavoring to heal her of her goiter? A. To adjust her mind to the Divine mind; yes.

"Q. I say, that is the substance of what you talked over with her, when you endeavored to adjust her mind to the Divine mind? A. Yes.

"Q. Or Divine Order? A. Yes.

"Q. Then, this prayer (reading):

" 'Great Father, Source of all, in whom I live and move and have my being, Thou alone art my God. Thee only do I worship. Thou

are the supreme idea of my life. I allow no lesser thought to take Thy high place on the throne of my being. I have no other Gods before Thee. I bow down to no false thought images of my own making. This means that I do not talk on any one subject continually. It means that I do not monopolize conversation. It means that I am not absorbed by thoughts that are less than the thought of Thee.

" 'Thou art the supreme God. Thou hast made me too a god. In Thy greatness I see my greatness. I am powerful because I am free of all thoughts that are unlike Thee. I am free because I am filled with Thy love. Thy love dissolves all that would imprison me.

" 'Generous Father, I too am generous. I know that all good things must be kept in circulation. Congestion of money, of time, of thoughts, helps no one. When I see what another has claimed of Thy treasures, I am not covetous. I remember that Thy treasures are for all. Thou hast already given me all that I can use. Thou hast already proved to me through Thine illustrious Son, that all Thino is mine when I have proved myself worthy of using it. My desire is not to amass more than I can use, but to use to Thy glory that which I have already claimed from Thee. As fast as I rightfully use what I now have, Thou wilt pour more upon me. My treasure house is ever full.' "

Testatrix had been a reader of Unity literature prior to the year 1911. Unity, through its publication department, issued pamphlets and periodicals devoted to the teaching and spreading of Unity. Through these pamphlets it indirectly, if not directly, solicited contributions from its readers for the support and maintenance of Unity. It daily received through the mail numerous donations of various amounts.

The first business transaction between Unity and testatrix occurred in the year 1911, and consisted of a small loan to Unity of $150. Various amounts were so loaned to Unity from time to time and were repaid. In 1924, Unity was indebted to testatrix for nearly $11,000, represented by notes of Unity. It further developed in evidence that testatrix, through contracts between herself and Unity School, during the years 1924, 1925, 1926, transferred to Unity cash, stocks and bonds valued at about $150,000 for and in consideration of Unity, paying testatrix interest at the rate of six per cent per annum on the amount until her death. These contracts are in substance the same as the contract set out in full in the Klaber case, supra, at page 34 of 51 S. W. (2d). The question of entering into these contracts was first discussed by Mr. Charles Fillmore and testatrix in the year 1924. Mr. Fillmore testified with reference thereto as follows:

"Q. Now, can you tell me about when it was that there was first talk of these contracts? A. I cannot remember the date, but she

asked an appointment with me one day. She came over to the Administration Building and told me that she had from some source gotten the idea that money that one had might be loaned to an institution and interest received and the money go to the institution when the individual died, and she talked with me about it, and I told her that I thought it could be done, but I would consult our attorney about it and let her know. I did consult Mr. Basye, our attorney, and after that he did the business with her.

"Q. How many times did you talk with her altogether about these contracts? A. Why I would not state definitely. Whenever there was a problem up about money she would send me a memorandum. She was very methodical; she would send me a memorandum of what she had that she wanted the school to have and I would send that to Mr. Basye and he would go and see her."

Mr. Basye, attorney for Unity, drew the contracts transferring $50,000 to Unity. There is an abundance of testimony in the record that testatrix imposed implicit confidence in Mr. Charles Fillmore and that she regarded him as her spiritual adviser and her physical healer. Sometime during the year 1925 Mr. Basye advised testatrix to consult another lawyer with reference to her business affairs. Mr. Atwood testified that testatrix informed him that Mr. Basye gave her the names of a number of lawyers to select from, among which was the name of Mr. Atwood of the firm of Atwood, Wickersham, Hill and Chilcott. This firm thereafter represented testatrix. Mrs. Chilcott, wife of the junior member of the firm was an officer in, and an adherent of Unity. She received a salary of $6,000 per year. There is no evidence, however, that this fact had anything to do with testatrix going to this law firm for advice. On the first visit of testatrix to the law office of the firm mentioned, Mr. Atwood was consulted and a statement was made by testatrix, reduced to writing by a stenographer in the office, and signed by testatrix, to the effect that the contract of February 13, 1924, transferring property to Unity, was made without any undue influence being practiced by the officers of Unity and that it was made of her own free will. The statement explained in detail the reasons for executing the contract.

Lois L. Coldren, a recipient of a bequest of $5,000 was an adherent of Unity. A close friendship seems to have existed between Mrs. Coldren and Miss MacMahon. Mrs. Coldren was consulted by Miss MacMahon with reference to business affairs. She was in her company almost constantly. Mrs. Coldren accompanied Miss MacMahon on a visit to Ohio.

Testatrix inherited from her sister, Mrs. Sarah Huntington, who died in the year 1924, property and money of the value of approximately $150,000. The next of kin of testatrix also inherited large sums from their Aunt Sarah, sister of testatrix.

The evidence of the amounts so inherited by the next of kin of testatrix was introduced in evidence by appellants. Appellants also introduced evidence tending to prove that the wife of defendant, Richard R. MacMahon, also received a large amount from Mrs. Huntington, as a trust fund for the education of Mrs. Huntington's nieces. The trial court permitted proponents and contestants to introduce evidence showing in detail the business and social relationship existing between testatrix and her relatives and also between Mrs. Sarah Huntington and the nieces and nephews mentioned in this case.

Testatrix became ill during the winter of 1925-1926, and some one connected with Unity called Dr. E. M. Perdue. Dr. Perdue testified that testatrix, was suffering with a toxic goiter, which affected her mind; that she was physically weak and was also suffering with cardiac asthma. He further testified that testatrix was very erratic and irresponsible in the extreme and distinctly of unsound mind; that her physical ailments were incurable and that only temporary relief could be expected. Dr. Perdue waited on testatrix for about six weeks or more, calling on her almost daily. This witness was subjected to a lengthy and severe cross-examination, during which it was brought out that he did not belong to the American, Missouri State, or Jackson County Medical Associations. It was also shown that Dr. Perdue's method of diagnosing cases was not approved by the American Medical Association.

Dr. Edward T. Gibson in answer to a hypothetical question testified that in his opinion testatrix was insane at the time of the execution of the will in question. The witness, on cross-examination, was asked questions with reference to every fact contained in the hypothetical question. In this cross-examination the witness stated that if the circumstances surrounding the facts related in the hypothetical question were explained it might throw a different light upon the situation; that the acts were not necessarily the acts of an insane person; but, assuming the facts to be true, as related, without any explanation of the circumstances, it was his opinion testatrix was insane.

Mrs. W. R. Newton, a witness of contestants, testified that she frequently visited testatrix. This witness further stated that testatrix at times carried on a very sensible conversation but that when she spoke of Unity she seemed to be different and she had stated a number of times that she would never die; that to her Royal Fillmore was St. Paul and Charles Fillmore was Jesus Christ and when he talked she could see a halo around his head.

Mrs. Zoa MacMahon, wife of defendant, Richard R. MacMahon, testified that in her opinion testatrix was insane. Witness based her opinion upon general observations of the conduct of the testatrix and of statements made by her. She testified that, prior to the bobbed

hair age, in the year 1906, testatrix had her hair cut, saying that it caused her to have headaches. The witness further testified that about the year 1915, while testatrix was at the home of her sister, Mrs. Sarah Huntington, the following occurred:

"A. Well, of course, as I said she was always talking Unity, always, and one morning—she refused to sleep on the second floor where Mrs. Huntington and I were sleeping, she fixed her own bed on the third floor, and she came downstairs one morning and she said, 'Zoa, the most wonderful thing happened last night. . . . Christ appeared in my room last night and I held out my arms to him and he disappeared.' . . .

"A. (continuing) I just let her talk about it.

"Q. Based upon your observation of her, what is now your opinion of her mental condition at that time? A. Well, I didn't think she was right, of course. . . ."

Richard R. MacMahon testified that testatrix talked irrationally at times and it was his opinion that she was affected with mental trouble. When asked to state upon what he based his opinion, witness stated that at one time testatrix threw her false teeth in the fire and permitted them to burn and thereafter when the dentist called at the house to see her she called down from upstairs, "O jolly doctor," and laughed in a shrill voice; that at times testatrix would sit and stare and talk irrationally; that at one time when testatrix desired to visit the witness and his family she boarded a train at Columbus, Ohio, for New Lexington, the home of the witness; that the testatrix failed to get off of the train at New Lexington and then was unable to tell the conductor where she wanted to go, so the conductor sent her back to Columbus.

Prior to the execution of the will, plans had been made whereby Unity was to build a home at a cost of about $20,000, on Unity farm, for the use of testatrix. This home was completed in accordance with the plans suggested by testatrix. She lived in it a few months and then was taken to small quarters near Unity center, where she died. Testatrix was to have the use of the home and pay a monthly rental of $150. The home was paid for by Unity and was its property. Testatrix had, prior to this time and since the year 1911, lived in small, unpretentious quarters. When she was taken to the new home on Unity farm she was very feeble, in ill health and rapidly growing weaker.

It also developed in evidence that a guardian was appointed for the sister of testatrix, Mrs. Sarah Huntington; that Mrs. Huntington had been divested of more than $200,000 worth of stock and bonds, prior to the time a guardian was appointed, due to the fact that she was incapable of managing her business affairs.

There are other fragments of testimony of little importance in the record, tending to prove eccentricities and peculiarities on the part

of testatrix. As against this evidence proponents introduced much testimony tending to prove that testatrix was a well educated, highly cultured and refined lady with a mentality above normal. Dr. Marie Esmond testified that she waited on and treated testatrix during her last illness; that she found her suffering with chronic endocarditis and a dropsical condition due to her heart trouble. This witness also testified that testatrix had a non-toxic goiter, which did not affect her mentally in any way; that testatrix was rational and of sound mind at all times, even to the last minute of her life, and that she considered her a woman of superior intelligence. Witness stated that she informed testatrix that her condition was hopeless and that she had only a short time to live; that on the morning of her death she was sitting in a chair and fully realized her time had come; that she attended to a few business matters, signed a number of checks and gave directions for a few Christmas presents.

Mrs. Emma Teeters, a nurse, was called as a witness and testified that she waited on Miss MacMahon as a nurse from the first week in July until December 11, when testatrix died. This witness corroborated Dr. Esmond with reference to Miss MacMahon being a highly cultured woman and of sound mind. She stated that on the morning of her death, when Dr. Esmond had informed testatrix that she could live only a few hours, testatrix gave directions as to a few business matters and then said: ''Jesus I am ready, take me now,'' and then died within a few minutes.

The circumstances of the preparation and the signing of the will were detailed in evidence and many witnesses, who had known testatrix a number of years testified that she was of sound mind.

■ Our function, however, is not to weigh the evidence but only to determine whether or not there is substantial evidence in the record to support the verdict of the jury, who are the sole judges of the credibility of the witnesses and the weight to be given to their testimony. Appellants earnestly insist that there was not sufficient evidence introduced in support of the charge of mental incapacity or undue influence to submit either question to the jury. In determining this question we must consider the evidence as a whole in the light most favorable to contestants. Considering the evidence in the light of this rule of law we are constrained to hold that respondents made a case for the jury on both issues.

■ The fact that Dr. Perdue was not a member of the American Medical Association and that his method of diagnosing cases had been condemned by that association was fully shown at the trial and was proper for the jury to consider in passing upon the weight of Dr. Perdue's evidence. The interests of the other witnesses and their opportunities to observe testatrix with reference to her mental condition were fully disclosed upon cross-examination and by evidence introduced by proponents. The trial court permitted the evidence

to take a wide range and every detail was disclosed which in any way affected the credibility of the witnesses testifying for contestants. It is true, as appellants contend, that opinions of medical experts, based on hypothetical questions, have been disregarded and considered of no value by the courts when the facts upon which the opinion was based were without any reasonable foundation. [Riley v. Sherwood, 144 Mo. 354, 45 S. W. 1077; Sayre v. Trustees of Princeton University, 192 Mo. 95, 90 S. W. 787; Berkemeir v. Reller, 37 S. W. (2d) 430. Also same case in 296 S. W. 739, 317 Mo. 614.]

However, that rule does not apply to Dr. Perdue, whose testimony was not based on a hypothetical question but on information obtained during the time he was treating testatrix. [11 R. C. L. 609, sec. 33; 40 Cyc. 1036, and cases cited under note 35; Rock v. Keller, 278 S. W. 1. c. 767 and 768 (11), 312 Mo. 458; Payton v. Shipley, 195 Pac. (Okla.) 1. c. 126 (1); In re Cooper's Estate, 206 N. W. (Iowa) 1. c. 96 (2); Donnelly v. Donnelly, 143 Atl. (Md.) 1. c. 650 (5, 6).]

It was conclusively shown, by the evidence of proponents, that testatrix looked upon Mr. Charles Fillmore as her spiritual adviser and also as her physical healer. She received weekly instructions from Mr. Fillmore with reference to the cure of her goiter. The fact that she placed implicit confidence in him is beyond question, and that she looked to him for guidance in both spiritual and material matters is plainly discernible from the evidence. Some of the checks payable to Unity, signed by testatrix, were prepared by Mr. Fillmore. These circumstances standing alone authorized the jury to find that a confidential relationship existed between testatrix and Mr. Charles Fillmore. In addition to this we find in the record that testatrix did seek advice from Mr. Fillmore as to the disposition of her property. Mr. Fillmore testified that he discussed this matter with testatrix and sent her to the attorney for Unity. These consultations ultimately culminated in contracts transferring to Unity approximately $150,000 for and in consideration of Unity agreeing to pay her six per cent interest during her lifetime. This, at a time when physicians said testatrix had but a short time to live and when it was apparent that she was in failing health. It is true that the validity of these contracts is not here in question, but the circumstances under which they were made was proper evidence for the consideration of the jury in determining the question of whether or not undue influence was exercised in the procurement of the alleged will. Testatrix, living and moving about under these environments and afflicted with a goiter that had been troubling her since, and prior to the year 1905, was taught, by Mr. Charles Fillmore, through the teaching of Unity, that the cause of goiter was greed and for the cure of this goiter she should meditate daily upon the prayer above quoted. Parts of this prayer are, after a recitation on the generousness of God, as follows: "Generous Father, I too am

generous. I know that all good things must be kept in circulation. Congestion of money, of time, of thoughts, helps no one. . . . My desire is not to amass more than I can use, but to use to Thy glory that which I have already claimed from Thee.''

On the other hand the evidence discloses that testatrix was fully and fairly advised as to her rights in the matter of the disposition of her property, by Mr. Atwood and Mr. Wickersham, and that no influence of any kind was exerted, or any suggestion made to her, by them, as to how she should dispose of her property. When testatrix went to the office of the attorneys mentioned she had in mind a fixed purpose to give all her property to Unity. This is evidenced by the fact that she had already transferred large portions of her estate to Unity through the contracts already mentioned. Much can also be said as to why she did not leave her property to her next of kin. They had received substantial amounts from their Aunt Sarah. All of this was, however, fully disclosed at the trial and presented to the jury. The jury found against appellants. There being substantial evidence to support that finding we are not justified to interfere therewith.

Appellants also contend that a charitable institution cannot exercise undue influence; that, if any fiduciary or confidential relationship existed between testatrix and the Fillmores, this fact should not have been considered by the jury, because the Fillmore family received no bequest or direct benefit under the will. These same questions were before the court in Klaber v. Unity School of Christianity, 330 Mo. 854, 51 S. W. (2d) 30, l. c. 32. It was there in effect held that persons may exercise undue influence in behalf of a charitable or religious institution so as to nullify a will made in pursuance thereof. [Hegney v. Head, 126 Mo. 619, 29 S. W. l. c. 590.] In this case, however, we are of the opinion that the Fillmore family indirectly received a benefit under the will in question. In the Klaber case, supra, Division One of this court, speaking through ATWOOD, J., said ''The fact that they had power to fix and appropriate to themselves the direct or indirect benefit of such a gift, which would have been beyond their reach had the gift gone elsewhere, clearly distinguishes this case from Ryan v. Rutledge (Mo.), 187 S. W. 877, cited by respondent.''

In a will contest case the mere showing of a confidential relationship existing between a testator and a recipient of a bequest is insufficient to make a case for the jury on the question of undue influence. [Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772.] However, in this case facts and circumstances were shown from which the jury was justified in finding that undue influence was exercised, by the officers of Unity, in procuring testatrix to make a bequest in its favor. It was, therefore, a proper case for a jury to determine.

Appellants complain of Instruction No. 7, which reads:

"The court instructs you that if you find and believe from the evidence that Unity School of Christianity, this beneficiary under the paper writing offered in evidence purporting to be the will of Laura R. MacMahon, deceased, and its principal officers and agents, at the time such paper was signed, sustained close and confidential relations to the deceased which caused the deceased habitually to look to and rely upon it and them for advice, counsel and direction in and about her business and personal matters, and that such beneficiary through some of its principal officers or agents was at such time acting as and occupying the relation to her of being her spiritual adviser and physical healer, the law presumes that the paper writing purporting to be her will was the result of undue influence and the burden is upon the proponents of said paper writing, offered as the decedent's, Laura R. MacMahon, will, to rebut such presumption."

By this instruction, the jury were told that, if they found and believed from the evidence that a confidential relationship existed between testatrix and the officers of Unity, then it was to be presumed that the alleged will was the result of undue influence and the burden was upon proponents to rebut such presumption. The instruction authorized the jury to set aside the will on the mere showing of the existence of a confidential relationship, unless the bequest in the will was satisfactorily explained by proponents, so as to overcome the presumption. This rule of law has been followed in many Missouri cases as will be noted on 40 Cyc. 1151, note 96. But in the case of Loehr v. Starke, supra, the court en banc joined the majority rule, and it is now held that the mere showing of a confidential relationship is not sufficient to raise the presumption of undue influence. For other authorities see 40 Cyc. 1151 and cases cited. [See, also, In re Llewellyn, 66 A. L. R. 228.] There was sufficient evidence in this case, in connection with the showing of a confidential relationship, to justify the trial court in submitting the case to a jury. But the instruction above quoted authorized the jury to set aside the will on the presumption of undue influence arising alone from such confidential relationship. Therefore, the giving of this instruction requires a reversal of the case especially in view of the fact that there was much evidence introduced by proponents to negative undue influence.

Appellants assert that the giving of this instruction was also error for the reason that it was broader than the pleadings; that no confidential relationship was pleaded. The petition is rather vague and indefinite with reference to this charge. That objection, however, can be cured by an amendment of plaintiff's petition, prior to a retrial of the case, if respondent sees fit to do so.

■ Error is also assigned to the trial court in permitting lay witnesses to testify that testatrix was of unsound mind, without

requiring the witnesses to relate facts upon which to base such an opinion. The rule is well settled that a lay witness must, before expressing an opinion, relate the facts upon which the opinion of insanity is based. The facts related must be inconsistent with sanity, taking into consideration the surrounding circumstances and the person whose sanity is questioned. [Berkemeier v. Reller, 37 S. W. (2d) l. c. 431 (1) and cases there cited. Also 22 C. J. 607, sec. 700.] On a retrial of this case this rule should be followed.

As above indicated, the judgment of the trial court must be reversed and the cause remanded for a new trial. It is so ordered. *Cooley* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the Court en Banc. All of the judges concur.